**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| UNILOC 2017 LLC, | § | |
| | § | |
| *Plaintiff,* | § | Case No. 2:18-CV-00493-JRG-RSP |
| | § | |
| v. | § | Case No. 2:18-CV-00499-JRG-RSP |
| | § | |
| GOOGLE LLC | § | Case No. 2:18-CV-00502-JRG-RSP |
| | § | |
| *Defendant.* | § | |

## CLAIM CONSTRUCTION
## MEMORANDUM AND ORDER

On January 10, 2020, the Court held a hearing to determine the proper construction of disputed claim terms in United States Patents No. 6,836,654 (Civil Action No. 2:18-CV-493), 8,194,632 (Civil Action No. 2:18-CV-499), and 8,407,609 (Civil Action No. 2:18-CV-502). Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing (Dkt. Nos. 143, 150 & 152),[1] having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

---

[1] Pursuant to the Court's November 22, 2019 Order (Civil Action No. 2:18-CV-493, Dkt. No. 135; Civil Action No. 2:18-CV-499, Dkt. No. 124; Civil Action No. 2:18-CV-502, Dkt. No. 122), the parties submitted consolidated claim construction briefing for Civil Actions No. 2:18-CV-493, -499, and -502. The Court therefore herein cites docket numbers in only Civil Action No. 2:18-CV-493 unless otherwise indicated. Citations to documents (such as the parties' briefs and exhibits) in this Claim Construction Memorandum and Order refer to the page numbers of the original documents rather than the page numbers assigned by the Court's electronic docket unless otherwise indicated.

## TABLE OF CONTENTS

I. BACKGROUND ........................................................................................................ 4

II. LEGAL PRINCIPLES ............................................................................................ 4

III. THE PARTIES' STIPULATED TERMS .............................................................. 7

IV. CONSTRUCTION OF DISPUTED TERMS IN U.S. PATENT NO. 6,836,654 ............ 8

    A. "linked user identification module" ................................................................... 9

    B. "ver[i]fying a user identification module mounted inside the mobile radiotelephony device is linked to the mobile radiotelephony device" ........................................ 13

    C. "preventing the normal operation of the mobile radiotelephony device / preventing a normal operation of the mobile radiotelephony device" ................................. 14

    D. "deblocking code" ............................................................................................. 17

    E. "protecting a mobile radiotelephone device" .................................................. 20

    F. "blocking means for preventing a normal operation of the mobile radiotelephony device" .................................................................................................................. 20

    G. "timing means for activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device" ................................ 26

    H. "deblocking means for permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time" ................................ 29

    I. "locking means for facilitating an activation of the block means by the timing means" ..... 32

    J. "connecting means for establishing a link between the mobile radiotelephony device and the linked user identification module" ................................................................. 34

V. CONSTRUCTION OF DISPUTED TERMS IN U.S. PATENT NO. 8,194,632 ............ 38

    AA. "mobile device" ............................................................................................. 38

    BB. "stationary terminal" ..................................................................................... 39

    CC. "short-range wireless technology" ................................................................ 45

    DD. "transmitting, by the stationary terminal, an invitation message comprising a network address relating to the stationary terminal and a remote device identifier to the proximate mobile device through the established communication link, whereupon the proximate mobile device establishes communication with the remote device" ................................ 50

    EE. "the established communication link" ............................................................ 51

    FF. "causes the processor to establish a data communications session between the stationary terminal and a remote mobile device, by performing all the steps of claim 1" ................. 52

GG. "the computer system comprising a processor configured to perform all the steps of claim 1" ................................................................................................................................ 55

## VI. CONSTRUCTION OF DISPUTED TERMS IN U.S. PATENT NO. 8,407,609 ........... 57

AAA. "web page" / "webpage" ................................................................................................. 57

BBB. "wherein each provided webpage causes [wherein each provided webpage causes corresponding digital media presentation data to be streamed]" ....................................... 61

CCC. "identifier data" ............................................................................................................. 62

DDD. "providing identifier data to the user's computer using the first computer system" .... 63

EEE. "storing data indicative of the received at least [a] portion of the identifier data using the first computer system" ................................................................................................ 63

FFF. "indicative of" ................................................................................................................ 64

GGG. "is indicative of an amount of time the digital media presentation data is streamed from the second computer system to the user's computer" ................................................. 67

HHH. "wherein each stored data is together" ......................................................................... 69

III. "wherein each stored data is together indicative of" ....................................................... 70

JJJ. "the stored data" .............................................................................................................. 71

KKK. "each stored data" ......................................................................................................... 72

LLL. "predetermined temporal period" .................................................................................. 72

MMM. "receiving at least a portion of the identifier data from the user's computer responsively to the timer applet each time a predetermined temporal period elapses using the first computer system" ................................................................................................ 76

NNN. "a second computer system distinct from the first computer system" .......................... 77

OOO. "providing an applet to the user's computer for each digital media presentation to be delivered using the first computer system" ..................................................................... 77

## VII. CONCLUSION ................................................................................................................ 78

# I.  BACKGROUND

Plaintiff Uniloc 2017 LLC ("Plaintiff" or "Uniloc") alleges that Defendant Google LLC ("Defendant" or "Google") infringes United States Patents No. 6,836,654 ("the '654 Patent"), 8,194,632 ("the '632 Patent"), and 8,407,609 ("the '609 Patent").

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.  Those preliminary constructions are noted below within the discussion for each term.

# II.  LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period."  *Teva*, 135 S. Ct. at 841 (citation omitted).  "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence.   These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal."  *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258,

1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough

the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120.

### III. THE PARTIES' STIPULATED TERMS

As to the '654 Patent, the parties submitted in their November 5, 2019 Joint Claim Construction Statement Pursuant to P.R. 4-3 (Dkt. No. 121 at 1) and in their December 26, 2019 P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 153, Ex. A at 1) that the parties agree upon the following constructions:

| Term | Agreed Construction |
|------|---------------------|
| "normal operation" | "operation of the mobile radio telephony device that includes the processing of all outgoing calls" |
| "a processing of [all] outgoing calls" | "the ability to make [all] outgoing calls" |

As to the '632 Patent, the parties submitted in their November 8, 2019 Joint Claim Construction Statement Pursuant to P.R. 4-3 (Civil Action No. 2:18-CV-499, Dkt. No. 116 at 1) and in their December 26, 2019 P.R. 4-5(d) Joint Claim Construction Chart (No. 2:18-CV-499, Dkt. No. 141, Ex. A at 1) that the parties agree upon the following constructions:

| Term | Agreed Construction |
|---|---|
| "remote device" | "Remote mobile device or remote stationary terminal" |
| "remote mobile device" | "Mobile device that is remote from the stationary terminal" |

As to the '609 Patent, the parties submitted in their November 8, 2019 Joint Claim Construction Statement Pursuant to P.R. 4-3 (Civil Action No. 2:18-CV-502, Dkt. No. 111 at 1) and in their December 31, 2019 P.R. 4-5(d) Joint Claim Construction Chart (No. 2:18-CV-502, Dkt. No. 140, Ex. A at 1) that the parties agree upon the following construction:

| Term | Agreed Construction |
|---|---|
| "applet" | Plain and ordinary meaning |

## IV. CONSTRUCTION OF DISPUTED TERMS IN U.S. PATENT NO. 6,836,654

The '654 Patent, titled "Anti-Theft Protection Device for a Radiotelephony Device," issued on December 28, 2004, and bears an earliest priority date of December 21, 1999. The Abstract of the '654 Patent states:

A mobile radiotelephony device intended for accommodating a linked user identification module offers protection against theft. The device prevents a normal operation of the device with an unlinked identification module, and permits the normal operation of the device with the linked identification module until such time the device has been inactive for a defined period of time. A debugging [*sic*] code can be supplied to the device subsequent to a detection of the defined period of time to again permit the normal operation of the device with linked identification module.

## A. "linked user identification module"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>    "a user identification module with which a mobile radiotelephony device permits normal operation" | "the only user identification module with which the mobile radio telephony device can be in normal operation" |

Dkt. No. 121, Ex. A at 1; Dkt. No. 143 at 2; Dkt. No. 153, Ex. A at 1–2.  The parties submit that this term appears in Claims 1, 5, 10, and 11 of the '654 Patent.  *Id.* at 1.

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "a user identification module that is the only one that permits normal operation of the device."

(1)  The Parties' Positions

Plaintiff argues that whereas its interpretation is supported by the plain claim language, "[t]here is no support for Defendant's proposed limitation that only one user identification module may be linked to a device."  Dkt. No. 143 at 2.

Defendant responds that the specification of the '654 Patent "describes U.S. Patent No. 5,913,175 (the ''175 patent') as requiring that normal operation can only occur when the device includes the linked user identification module," and "[t]he entirety of the '654 patent describes the 'linked user identification module' consistent with the teachings of the '175 patent."  Dkt. No. 150 at 2.  Defendant argues that its proposed construction "follow[s] directly from the patent's repeated and consistent teachings that the linked user identification module is the only module with which the mobile device can be in normal operation."  *Id.* at 1.

Plaintiff replies that "the Response does not provide anything to rebut the claim language's use of 'a' to mean one or more, or that the transitional phrase 'comprising' is open-ended."  Dkt.

No. 152 at 1.  Plaintiff urges that "[t]he claim language allows for one or more user identification module(s) to be linked to the mobile device, any of which being so linked, permitting a normal operation."  *Id.*

At the January 10, 2020 hearing, Plaintiff argued that a user could link one module and then link another, thereby resulting in more than only one linked module.  Defendant responded that the specification explains that the only way to get out of the relevant blocking state is to install *the* linked module.  Plaintiff replied that, in the specification, "linking" refers to reading an "IMSI" identification number from the module and storing the IMSI in the mobile device.  Plaintiff argued that there is no reason a mobile device could not store more than one IMSI.

(2)  Analysis

Claim 10 of the '654 Patent recites (emphasis added):

10.   A method of protecting a mobile radiotelephony device, the method comprising:
> *ver[i]fying a user identification module mounted inside the mobile radiotelephony device is linked to the mobile radiotelephony device*;
> detecting a period of inactivity of the mobile radiotelephony device during a normal operation of the mobile radiotelephony device, wherein the normal operation includes a processing of all outgoing calls;
> preventing the normal operation of the mobile radiotelephony device in response to the verification of the linked user identification module and in response to the detection of the period of inactivity of the mobile radiotelephony device.

Claim 16 of the '654 Patent, which depends from Claim 10, provides further context for "linked" by reciting (emphasis added): "The method of claim 10, further comprising: preventing the normal operation of the mobile radiotelephony device in response to any *unlinked* user identification module being mounted inside the mobile radiotelephony device."  The claims thus refer to a user identification module being either "linked" or "unlinked," and the parties agree that only a "linked" user identification module permits normal operation.  Defendants urge that, for a particular mobile radiotelephony device, there can be *only one* "linked" user identification module.

10

The above-reproduced claim language refers to "a" user identification module. On one hand, "[u]nless the claim is specific as to the number of elements, the article 'a' receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent to so limit the article." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). Further, this is a "comprising" claim, and "[i]n the parlance of patent law, the transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001).

On the other hand, there is no "hard and fast rule that 'a' always means one or more than one. Instead, we read the limitation in light of the claim and specification to discern its meaning." *Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011).

In discussing United States Patent No. 5,913,175 ("the '175 Patent," attached to Defendant's response brief as Exhibit 2), the '654 Patent refers to "establishing a link between the device and a *specific user identification module* and blocking the normal operation of the device when the user identification module that is placed inside the device is not *the one* that is linked to the device." '654 Patent at 1:20–30 (emphasis added). The '175 Patent also refers to a "locked mode" as to which "a link is established between the terminal and a *particular* user card (the linked user card)." '175 Patent at 2:14–20 (emphasis added). These discussions in the "Prior Art of the Invention" section, and in a referenced patent, support Defendant's interpretation.

The specification likewise refers to whether an identification module is "the *one* that is linked to the device." '654 Patent at 3:11–20 & 3:61–4:2 (emphasis added). Further, the specification discloses that a first blocking mode "is applied in the case where the device has been lost or stolen. The object is then to prevent the device being usable with *another* identification

module." *Id.* at 4:11–14 (emphasis added); *see id.* at 1:60–65 ("A fraudulent person cannot send communications at the cost of the owner of the device. But neither can he use the device with another identification module.").

Plaintiff suggests that a user could link a first module, replace the first module with a second module, and then link the second module. However, this suggestion is at odds with the explanation of linking that is set forth in the specification, which discloses that the "only way of leaving this first blocking state is . . . to place *the* identification module that is linked to the device inside the device." *Id.* at 3:28–31 (emphasis added). Figure 3 and the description thereof reinforce this understanding. Referring to Figure 3, in box K1 the user has access to a "configuration menu" whereby the user "has the choice of either or not locking his device." '654 Patent at 2:63–66. "When the user locks his device," the module that is in the device is "automatically *linked* to the device." *Id.* at 2:67–3:2. Figure 3 and the description thereof explains how the user could return to box K1, thus regaining access to the configuration menu. *See id.* at 3:32–52.

Plaintiff appears to assume that, upon the user returning to the configuration menu and choosing "not locking," the linked module would *remain* linked. Nothing in the specification, however, supports Plaintiff's suggestion that repeatedly "locking" could result in multiple "linked" cards. Instead, a fair reading of the disclosures in column 3 of the specification is that the "linked" module is the particular module that was in the device at the time of locking (and that was thus automatically linked when the user locked the device). This interpretation of "linked" "most naturally aligns with the patent's description of the invention." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)); *see Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008) ("specification's consistent emphasis on this fundamental feature of the invention").

The Court therefore construes **"linked user identification module"** to mean **"a user identification module that is the only one that permits normal operation of the device."**

**B. "ver[i]fying a user identification module mounted inside the mobile radiotelephony device is linked to the mobile radiotelephony device"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>    "confirming that a user identification module mounted inside the mobile radiotelephony device permits normal operation of the device" | "ensuring that the user identification module mounted inside the mobile radiotelephony device is the only user identification module that permits normal operation of the device" |

Dkt. No. 121, Ex. A at 1; Dkt. No. 143 at 1; Dkt. No. 153, Ex. A at 1. The parties submit that this term appears in Claims 10 and 11 of the '654 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "confirming that a user identification module mounted inside the mobile radiotelephony device permits normal operation of the mobile radiotelephony device."

The parties argue this term together with the term "linked user identification module," which is addressed above, as to the meaning of "linked" in this context. Dkt. No. 143 at 2; *see* Dkt. No. 150 at 1–4; *see also* Dkt. No. 152 at 1. The Court's construction of "linked user identification module," above, resolves the dispute.

As to the parties' respective proposals of interpreting "verifying" to mean either "confirming" or "ensuring," the Court finds that Plaintiff's proposal of "confirming" is clearer. At the January 10, 2020 hearing, Defendant expressed no concern regarding Plaintiff's proposal of "confirming." Also, the parties' respective proposed constructions reflect agreement as to the phrase "permits normal operation of the device."

For these reasons, the Court construes **"ver[i]fying a user identification module mounted inside the mobile radiotelephony device is linked to the mobile radiotelephony device"** to mean **"confirming that a user identification module mounted inside the mobile radiotelephony device permits normal operation of the mobile radiotelephony device."**

**C. "preventing the normal operation of the mobile radiotelephony device / preventing a normal operation of the mobile radiotelephony device"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No separate construction needed from "normal operation" | "preventing processing of at least all non-emergency outgoing calls" |

Dkt. No. 121, Ex. A at 1; Dkt. No. 143 at 2; Dkt. No. 150 at 4; Dkt. No. 153, Ex. A at 2. The parties submit that these terms appear in Claims 1 and 10 of the '654 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "preventing the mobile radiotelephony device from processing one or more outgoing calls."

At the January 10, 2020 hearing, Plaintiff had no objection to the Court's preliminary construction.

(1) The Parties' Positions

Plaintiff argues that "[t]hese terms require no more than inserting the word 'preventing' in front of the agreed-upon definition of 'normal operation.'" Dkt. No. 143 at 2.

Defendant responds that its proposed construction "aligns with the '654 patent's stated purpose, coheres with the agreed construction of 'normal operation,' and fully accords with intrinsic evidence." *Id.* Defendant also argues, for example, that "[s]imply preventing 'at least one' outgoing call cannot be squared with the parties' agreed meaning of 'normal operation' to 'include[] the processing of all outgoing calls,' nor with the very purpose of the '654 patent:

'protect[ing] against theft' such that a 'fraudulent person cannot send communications at the cost of the owner of the device.'" Dkt. No. 150 at 5 (citing '654 Patent at 1:61–65) (emphasis omitted).

Plaintiff replies that "[t]he Response confirms that Defendant seeks to limit this term based on non-limiting language and embodiments from the specification," and "the specification provides for possible exceptions to preventing *all* outgoing calls." Dkt. No. 152 at 1. Further, Plaintiff argues, "dependent claims 2 and 12 are further evidence that independent claims 1 and 10 are broad enough to allow *some* calls (including non-emergency calls)." *Id.*

At the January 10, 2020 hearing, Defendant urged that preventing only one outgoing call would frustrate the purpose set forth in the patent. Defendant also argued that the specification describes blocking calls *categorically*, not individually.

(2)  Analysis

Claims 1, 2, and 3 of the '654 Patent recite (emphasis added):

1.  A mobile radiotelephony device, comprising:
    blocking means for *preventing a normal operation of the mobile radiotelephony device*, wherein the normal operation includes a processing of outgoing calls;
    timing means for activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device; and
    deblocking means for permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time.

2.  The mobile radiotelephony device of claim 1, wherein an activation of the blocking means prevents *all* transmission of outgoing calls.

3.  The mobile radiotelephony device of claim 1, wherein an activation of the blocking means *prevents all transmissions of non-emergency outgoing calls* and *permits all transmissions of emergency outgoing calls*.

The parties agree that "normal operation" means "operation of the mobile radio telephony device that includes the processing of all outgoing calls." Dkt. No. 121 at 1. Thus, Claim 1 prevents at least some outgoing calls, dependent Claim 2 prevents *all* outgoing calls (including emergency outgoing calls), and dependent Claim 3 prevents all non-emergency outgoing calls but permits all emergency outgoing calls. Read in the context of Claims 2 and 3, Claim 1 does not necessarily prevent *all* transmission of outgoing calls.

As to whether "preventing the normal operation" requires preventing all non-emergency calls rather than potentially merely some calls, Defendant emphasizes that the specification refers to preventing all non-emergency outgoing calls (which is disclosed as being desirable if a device is lost or stolen):

> If the identification module, which is placed inside the device, is not the one that is linked to the device (arrow N4), the device goes to a first blocking state indicated in box K5. In this first blocking state, the device is disconnected from the network. Thus it can no longer receive an incoming call nor transmit an outgoing call (possibly with the exception of emergency numbers).
>
> * * *
>
> In this second blocking state the device only processes incoming calls (box K13) and, possibly, the outgoing calls that correspond to emergency numbers (box K14).
>
> * * *
>
> The first blocking mode is applied in the case where the device has been lost or stolen. The object is then to prevent the device being usable with another identification module. It thus advantageously blocks the incoming and outgoing calls at the same time. The second blocking mode is applied in the case where the identification module that is linked to the device is in its place inside the device and the device is in a state of availability. The object is to prevent a third party being able to send outgoing calls with this device if it is lost, stolen or left without attendance for some time.

'654 Patent at 3:14–20, 3:44–46 & 4:11–20; *see id.* at 1:60–65 ("Thanks to the invention the lost or stolen device becomes totally unusable."). Defendants urge that the claims "must be read in

light of the specification's consistent emphasis on this fundamental feature of the invention."
*Praxair*, 543 F.3d at 1324.

Defendant's proposed construction would improperly limit the "preventing" language of the disputed term to certain specific features of disclosed embodiments. *See Comark*, 156 F.3d at 1187; *see also Phillips*, 415 F.3d at 1323. Instead, as confirmed by the context provided by the above-reproduced claims, this "preventing" limitation refers to preventing at least one or more outgoing calls.

The Court therefore construes **"preventing the normal operation of the mobile radiotelephony device"** and **"preventing a normal operation of the mobile radiotelephony device"** to mean **"preventing the mobile radiotelephony device from processing one or more outgoing calls."**

**D. "deblocking code"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "code that returns a device to normal operation" | "a string of characters, such as a PIN code, that are entered to return a device to normal operation" |

Dkt. No. 121, Ex. A at 1; Dkt. No. 143 at 4; Dkt. No. 153, Ex. A at 2. The parties submit that this term appears in Claims 1 and 11 of the '654 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "code that, when supplied, returns a device to normal operation."

At the January 10, 2020 hearing, Plaintiff had no objection to the Court's preliminary construction.

<u>(1)  The Parties' Positions</u>

Plaintiff argues that "Uniloc's construction is correct because there is no requirement, disclosure in the specification, or intrinsic evidence that limits a 'deblocking code' to 'a string of characters.'"  Dkt. No. 143 at 3.

Defendant responds that "Google does not seek to limit this term to a Personal Identification Number (PIN)" but rather "provides a PIN as an example."  Dkt. No. 150 at 6.

Plaintiff replies that "Defendant continues to rely on non-limiting examples to improperly import limitations from the specification into the claim language."  Dkt. No. 152 at 2.

<u>(2)  Analysis</u>

The specification discloses:

Thus, when the device falls into the hands of a third party together with the identification module to which it is linked, it has most probably been inactive for a period of time that is sufficiently long for its normal operation to be blocked (advantageously, the inactive time after which the blocking means are activated is of the order of several minutes).  The device cannot thus be used without the deblocking code being supplied.

* * *

If the identification module that is placed inside the device is linked to the device (arrow Y4), one looks whether the device has remained in the state of availability for a certain period of time T of the order of several minutes, for example (box K10).  If this is not the case (arrow N10), the device remains in the state of availability indicated in box K1.  If this is the case (arrow Y10), the device passes on to a second blocking state indicated in box K11 by passing through an initialization step K12 which permits to initialize a variable A which represents the number of attempts made at supplying a deblocking code (for example, the Personal Identification Number) PIN.

In this second blocking state the device only processes incoming calls (box K13) and, possibly, the outgoing calls that correspond to emergency numbers (box K14).  Once these calls have been processed, the device goes back to the second blocking state indicated in box K11.  In the second blocking state K11 a message inviting the user to supply a deblocking code is displayed on the screen.  If the code taken by the user is recognized (arrow Y11), the device goes back to the state of availability indicated in box K1.  If it is not recognized (arrow N11), the value of

the variable A is tested (box K15). If this value is lower than a certain figure (for example 3), the value of A is augmented by unity (box K16) and a message is displayed on the screen to indicate the user that the code is not valid (box K17). Then the device goes back to the second blocking state indicated in box K11. If the variable A is higher than or equal to said figure, the test of box K15 causes the total blocking of the device indicated in box K30. To leave this third blocking state it is necessary to contact the organization that provides the identification module. One is then again in the state of availability K1.

'654 Patent at 1:52–59 & 3:32–52.

Defendant cites disclosures in the specification that refer to a "deblocking code" as being a "pin code":

Advantageously the deblocking code, which is to be supplied to return to the normal operating mode, is formed by the pin code (Personal Identity Number) which is contained in the identification module (compare standards relating to the GSM radiotelephony systems). Thus the user need not store an additional code to ensure the protection of his device.

*Id.* at 2:11–15. Because Defendant proposes "PIN code" only as an example (Dkt. No. 150 at 6), the parties' dispute centers on whether a deblocking "code" must be a "string of characters." As support for requiring characters, Defendant emphasizes disclosure of a device that has a keypad. *See id.* at 2:35–39 & Fig. 1 (keypad 9). At the January 10, 2020 hearing, Defendant emphasized this disclosure of a keypad. This disclosure, however, refers to an "example" and does not purport to define "deblocking code." Finally, the example of a "PIN code," which Defendant asserts must be made up of characters, does not compel finding that all deblocking codes must be made up of characters.

The Court therefore construes **"deblocking code"** to mean **"code that, when supplied, returns a device to normal operation."**

## E.  "protecting a mobile radiotelephone device"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Preamble is not limiting | "protecting a mobile radiotelephony device from theft" |

Dkt. No. 121, Ex. A at 1; Dkt. No. 143 at 4.

Defendant's response brief does not address this term.  *See* Dkt. No. 150.  Also, this term does not appear in the parties' December 26, 2019 P.R. 4-5(d) Joint Claim Construction Chart. *See* Dkt. No. 153 at Ex. A.  Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary finding: "This term is no longer in dispute." Neither party objected to this preliminary finding.

The Court concludes that this term is no longer in dispute.  The Court therefore does not further address this term.

## F.  "blocking means for preventing a normal operation of the mobile radiotelephony device"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| This term is governed by 35 U.S.C. § 112(6)<br><br>Function:<br>    "preventing a normal operation of the mobile radiotelephony device"<br><br>Structure:<br>    "a device with a microprocessor assembly, programmed to execute one or more blocking modes or equivalents thereof, such as executing blocking modes depending on whether an identification module inside the device is linked to the device, or in response to detection of a period of inactivity of the device, or equivalents thereof" | Subject to 35 U.S.C. § 112, ¶ 6<br><br>Function:<br>    "preventing a normal operation of the mobile radio telephony device"<br><br>Structure:<br>    No corresponding structure for performing the claimed function is disclosed in the specification of the '654 patent.  This term is therefore indefinite. |

Dkt. No. 121, Ex. A at 1–2; Dkt. No. 143 at 5 & 6; Dkt. No. 153, Ex. A at 2–3. The parties submit that this term appears in Claims 1–3 of the '654 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "35 U.S.C. § 112, ¶ 6 applies / Function (agreed): 'preventing a normal operation of the mobile radio telephony device' / Structure: 'the mobile radiotelephony device implementing any of the following: (1) disconnecting the device from the network (3:17–18), (2) ceasing to process all or non-emergency outgoing calls (3:44–46), and (3) ceasing to process all calls (3:58–63), and equivalents thereof.'"

At the January 10, 2020 hearing, Plaintiff had no objection to the Court's preliminary construction.

(1)  The Parties' Positions

Plaintiff argues that the specification discloses adequate corresponding structure because "the intrinsic evidence teaches a microprocessor assembly performing a set of instructions (an algorithm)." Dkt. No. 143 at 7; *see id.* at 5–7.

Defendant responds that "[n]owhere does the patent provide an algorithm to perform the claimed function." Dkt. No. 150 at 7. Defendant also argues that "[a]bsent from [Plaintiff's] construction is an explanation of what 'blocking modes' are or *how* they are programmed, much less any algorithm to perform the function of 'preventing a normal operation.'" *Id.* Further, Defendant argues that "[t]he phrase 'blocking modes' conveys no more structural information than 'blocking means,' which Uniloc concedes is not structure." *Id.*

Plaintiff replies that "the Response cherry-picks phrases from the specification's recitation of its algorithm to argue that those passages only disclose 'states', however, the specification in fact discloses the algorithm for moving between the states of operation." Dkt. No. 152 at 2.

At the January 10, 2020 hearing, Defendant argued that the disclosures cited by Plaintiff are insufficient because those disclosures refer to an *outcome* without explaining how to achieve that outcome. Plaintiff responded that the specification provides an algorithm not only in prose but also in the form of a flow chart as set forth in Figure 3 of the '654 Patent. Defendant replied that merely moving between states is not an algorithm. *See, e.g., Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012) ("Even described in prose, an algorithm is still a step-by-step procedure for accomplishing a given result.") (citation and internal quotation marks omitted).

(2) Analysis

Title 35 U.S.C. § 112, ¶ 6 provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." "The literal scope of a properly construed means-plus-function limitation does not extend to all means for performing a certain function. Rather, the scope of such claim language is sharply limited to the structure disclosed in the specification and its equivalents." *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1367 (Fed. Cir. 2001). Further, "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003) (citation and internal quotation marks omitted).

The parties agree on the claimed function. The parties dispute whether the specification discloses sufficient corresponding structure for performing the claimed function. Plaintiff submits that the claimed function is implemented by a general-purpose processor, so an algorithm is

required.  *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."); *see also Net MoneyIN Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008) (citing *WMS Gaming*); *Ergo*, 673 F.3d at 1364 ("Requiring disclosure of an algorithm properly defines the scope of the claim and prevents pure functional claiming.").

Plaintiff cites the following portion of the specification as disclosing an algorithm for performing the claimed function:

> In FIG. 3 is represented a function flow chart of a device in accordance with the invention.  This flow chart starts at box K1.  In box K1 the device is in a state of availability, that is to say that *the user has access to all the functions of the device*. The user has the choice of either or not locking his device.  This locking (L)/unlocking (UL) is done by accessing a configuration menu of the device.  When the user locks his device (box K2), the identification module that is inside the device is automatically linked to the device.  For this purpose, the device starts reading a data D1 in the identification module (for example, the international identification number IMSI) and he stores it in the random-access memory 24.  Once locked, the device remains in the state of availability indicated in box K1.  When the device is in the state of availability, one looks whether it is locked (box K3).  If it is not locked (arrow N3), the device remains in the state of availability indicated in box K1.  If it is locked (arrow Y3), one looks whether the identification module which is placed inside the device is the one that is linked to the device (box K4).

> If the identification module, which is placed inside the device, is not the one that is linked to the device (arrow N4), the device goes to a first blocking state indicated in box K5.  *In this first blocking state, the device is disconnected from the network.* Thus it can no longer receive an incoming call nor transmit an outgoing call (possibly with the exception of emergency numbers).  In the blocking state K5, the screen shows a message inviting the user to insert the proper module into the device. And when the user inserts a new module, one looks whether this new identification module is the one that is connected to the device (box K7).  If this is the case (arrow Y7), the device is reconnected to the network in accordance with the normal procedure (box K8) and then the device returns to the state of availability indicated in box K1.  If not (arrow N7), the operation is resumed in box K5.  The only way of leaving this first blocking state is thus to place the identification module that is linked to the device inside the device.

If the identification module that is placed inside the device is linked to the device (arrow Y4), one looks whether the device has remained in the state of availability for a certain period of time T of the order of several minutes, for example (box K10). If this is not the case (arrow N10), the device remains in the state of availability indicated in box K1. If this is the case (arrow Y10), the device passes on to a second blocking state indicated in box K11 by passing through an initialization step K12 which permits to initialize a variable A which represents the number of attempts made at supplying a deblocking code (for example, the Personal Identification Number) PIN.

*In this second blocking state the device only processes incoming calls (box K13) and, possibly, the outgoing calls that correspond to emergency numbers (box K14).* Once these calls have been processed, the device goes back to the second blocking state indicated in box K11. In the second blocking state K11 a message inviting the user to supply a deblocking code is displayed on the screen. If the code taken by the user is recognized (arrow Y11), the device goes back to the state of availability indicated in box K1. If it is not recognized (arrow N11), the value of the variable A is tested (box K15). If this value is lower than a certain figure (for example 3), the value of A is augmented by unity (box K16) and a message is displayed on the screen to indicate the user that the code is not valid (box K17). Then the device goes back to the second blocking state indicated in box K11. If the variable A is higher than or equal to said figure, the test of box K15 causes the total blocking of the device indicated in box K30.

'654 Patent at 2:61–3:61 (emphasis added). The disclosure that "the device is disconnected from the network," as well as the disclosures regarding only certain types of calls being processed, link these disclosures to the claimed function. *See id.* Also, although Defendant urged at the January 10, 2020 hearing that these discloses lack sufficient explanation, "the patentee is not required to include in the specification information readily understood by practitioners, lest every patent be required to be written as a comprehensive tutorial and treatise for the generalist, instead of a concise statement for persons in the field." *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002).

On balance, these disclosures amount to a sufficient algorithm for performing the claimed function. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012) ("The specification can express the algorithm in any understandable terms including as a mathematical formula, in

prose, or as a flow chart, or in any other manner that provides sufficient structure.") (citation and internal quotation marks omitted). Contrary to Defendant's arguments, this disclosure does not amount to a mere "black box that performs the recited function." *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1338 (Fed. Cir. 2014); *see Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1383 (Fed. Cir. 2009) (citing *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2009), as having "rejected the patentee's assertion that language describing *when* the computer would perform the function at issue constituted a sufficient description of the structure for performing the function").

The Court therefore finds that **"blocking means for preventing a normal operation of the mobile radiotelephony device"** is a means-plus-function term, the claimed function is **"preventing a normal operation of the mobile radio telephony device,"** and the corresponding structure is **"the mobile radiotelephony device implementing any of the following: (1) disconnecting the device from the network (3:17–18), (2) ceasing to process all or non-emergency outgoing calls (3:44–46), and (3) ceasing to process all calls (3:58–63); and equivalents thereof."**

**G. "timing means for activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| This term is governed by 35 U.S.C. § 112(6). | Subject to 35 U.S.C. § 112, ¶ 6 |
| Function:<br>    "activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device" | Function:<br>    "activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device" |
| Structure:<br>    "a device with a microprocessor assembly, programmed to execute one or more blocking modes in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device, or equivalents thereof" | Structure:<br>    No corresponding structure for performing the claimed function is disclosed in the specification of the '654 patent.  This term is therefore indefinite. |

Dkt. No. 121, Ex. A at 2–3; Dkt. No. 143 at 7; Dkt. No. 153, Ex. A at 5–7.  The parties submit that this term appears in Claims 1 and 4 of the '654 Patent.  *Id.* at 5–6.

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "35 U.S.C. § 112, ¶ 6 applies / Function (agreed): 'activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony

device' / Structure: 'a device with a microprocessor assembly programmed to execute the algorithms set forth in the '654 Patent at 3:32–43; and equivalents thereof.'"

At the January 10, 2020 hearing, Plaintiff had no objection to the Court's preliminary construction.

(1)  The Parties' Positions

Plaintiff argues that this term is not indefinite because "the intrinsic evidence teaches a microprocessor assembly performing a set of instructions (an algorithm)."  Dkt. No. 143 at 7.

Defendant responds that "Uniloc's construction is a microprocessor 'programmed to execute one or more blocking modes' followed by repetition of the function," and "the term 'blocking modes' does not connote any algorithm."  Dkt. No. 150 at 9.

Plaintiff replies that "[t]he Response again fails to recognize that the specification discloses the algorithm for moving between the states of operation."  Dkt. No. 152 at 2.

At the January 10, 2020 hearing, Defendant presented substantially the same arguments as presented for the "blocking means . . ." term addressed above.

(2)  Analysis

Legal principles regarding 35 U.S.C. § 112, ¶ 6 are set forth above as to the "blocking means . . ." term.

As to the present disputed term, the parties agree on the claimed function.  The parties dispute whether the specification discloses sufficient corresponding structure for performing the claimed function.

The specification discloses:

If the identification module that is placed inside the device is linked to the device (arrow Y4), one looks *whether the device has remained in the state of availability for a certain period of time T of the order of several minutes*, for example (box K10).  If this is not the case (arrow N10), the device remains in the state of

availability indicated in box K1.  If this is the case (arrow Y10), the device *passes on to a second blocking state* indicated in box K11 by passing through an initialization step K12 which permits to initialize a variable A which represents the number of attempts made at supplying a deblocking code (for example, the Personal Identification Number) PIN.

In this second blocking state the device only processes incoming calls (box K13) and, possibly, the outgoing calls that correspond to emergency numbers (box K14). Once these calls have been processed, the device goes back to the second blocking state indicated in box K11.

'654 Patent at 3:32–48 (emphasis added).

The disclosure regarding "the state of availability" and "a certain period of time T" links this disclosure to the claimed function.  *See id.*  On balance, this disclosure amounts to a sufficient algorithm for performing the claimed function.  *Noah*, 675 F.3d at 1312.  Contrary to Defendant's arguments, this disclosure does not "simply restate[] the function to be performed."  *Rotatable Techs. LLC v. Nokia*, No. 2:12-CV-265, 2013 WL 3992930, at *13 (E.D. Tex. Aug. 2, 2013).

The Court therefore finds that **"timing means for activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device"** is a means-plus-function term, the claimed function is **"activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device,"** and the corresponding structure is **"a device with a microprocessor assembly programmed to execute the algorithms set forth in the '654 Patent at 3:32–43; and equivalents thereof."**

**H. "deblocking means for permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| This term is governed by 35 U.S.C. § 112(6).<br><br>Function:<br>　"permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time"<br><br>Structure:<br>　"a device with a microprocessor assembly, programmed to execute one or more deblocking modes to permit normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device, or equivalents thereof" | Subject to 35 U.S.C. § 112, ¶ 6<br><br>Function:<br>　"permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time"<br><br>Structure:<br>　No corresponding structure for performing the claimed function is disclosed in the specification of the '654 patent. This term is therefore indefinite. |

Dkt. No. 121, Ex. A at 3; Dkt. No. 143 at 8; Dkt. No. 153, Ex. A at 4–5. The parties submit that this term appears in Claim 1 of the '654 Patent. *Id.* at 4.

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "35 U.S.C. § 112, ¶ 6 applies / Function (agreed): 'permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time' / Structure: 'a device with a microprocessor assembly programmed to execute the algorithms set forth in the '654 Patent at 3:44–52; and equivalents thereof.'"

At the January 10, 2020 hearing, Plaintiff had no objection to the Court's preliminary construction.

(1) The Parties' Positions

Plaintiff argues that this term is not indefinite because "the intrinsic evidence teaches a microprocessor assembly performing a set of instructions (an algorithm)." Dkt. No. 143 at 8.

Defendant responds that "'deblocking modes' does not provide any algorithm or structure," and "[t]he rest of Uniloc's construction repeats the claimed function." Dkt. No. 150 at 9.

Plaintiff replies that "the Response mischaracterizes the disclosure of the specification, where in fact, the specification discloses the algorithm for moving between the states of operation." Dkt. No. 152 at 2.

At the January 10, 2020 hearing, Defendant presented substantially the same arguments as presented for the "blocking means . . ." term addressed above.

(2) Analysis

Legal principles regarding 35 U.S.C. § 112, ¶ 6 are set forth above as to the "blocking means . . ." term.

As to the present disputed term, the parties agree on the claimed function. The parties dispute whether the specification discloses sufficient corresponding structure for performing the claimed function.

The specification discloses:

If the identification module that is placed inside the device is linked to the device (arrow Y4), one looks whether the device has remained in the state of availability for a certain period of time T of the order of several minutes, for example (box K10). If this is not the case (arrow N10), the device remains in the state of availability indicated in box K1. If this is the case (arrow Y10), the device passes on to a second blocking state indicated in box K11 by passing through an initialization step K12 which permits to initialize a variable A which represents the

number of attempts made at supplying a deblocking code (for example, the Personal Identification Number) PIN.

In this second blocking state the device only processes incoming calls (box K13) and, possibly, the outgoing calls that correspond to emergency numbers (box K14). Once these calls have been processed, the device goes back to the second blocking state indicated in box K11. In the second blocking state K11 a message inviting the user to *supply a deblocking code* is displayed on the screen. If the code taken by the user is recognized (arrow Y11), *the device goes back to the state of availability* indicated in box K1. If it is not recognized (arrow N11), the value of the variable A is tested (box K15). If this value is lower than a certain figure (for example 3), the value of A is augmented by unity (box K16) and a message is displayed on the screen to indicate the user that the code is not valid (box K17). Then the device goes back to the second blocking state indicated in box K11. If the variable A is higher than or equal to said figure, the test of box K15 causes the total blocking of the device indicated in box K30. To leave this third blocking state it is necessary to contact the organization that provides the identification module. One is then again in the state of availability K1.

'654 Patent at 3:32–63 (emphasis added).

The disclosures regarding "the state of availability," "a certain period of time T," and "supply[ing] a deblocking code" link this disclosure to the claimed function. *See id.* On balance, this disclosure amounts to a sufficient algorithm for performing the claimed function. *Noah*, 675 F.3d at 1312. Contrary to Defendant's arguments, this disclosure does not "simply restate[] the function associated with the means-plus-function limitation." *Id.* at 1317.

The Court therefore finds that **"deblocking means for permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time"** is a means-plus-function term, the claimed function is **"permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time,"** and

the corresponding structure is **"a device with a microprocessor assembly programmed to execute the algorithms set forth in the '654 Patent at 3:44–52; and equivalents thereof."**

**I. "locking means for facilitating an activation of the block means by the timing means"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| This term is governed by 35 U.S.C. § 112(6).<br><br>Function:<br>    "facilitating an activation of the block means by the timing means"<br><br>Structure:<br>    "a device with a microprocessor assembly, programmed to link a user identification module to the mobile radiotelephony device, or equivalents thereof" | Subject to 35 U.S.C. § 112, ¶ 6<br><br>Function:<br>    "facilitating an activation of the block means by the timing means"<br><br>Structure:<br>    No corresponding structure for performing the claimed function is disclosed in the specification of the '654 patent.  This term is therefore indefinite. |

Dkt. No. 121, Ex. A at 4; Dkt. No. 143 at 9; Dkt. No. 153, Ex. A at 7–8.  The parties submit that this term appears in Claim 4 of the '654 Patent.  *Id.* at 7.

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "35 U.S.C. § 112, ¶ 6 applies / Function (agreed): 'facilitating an activation of the block means by the timing means' / Structure: None (indefinite)."

At the January 10, 2020 hearing, Defendant agreed with the Court's preliminary construction.

<u>(1)  The Parties' Positions</u>

Plaintiff argues that this term is not indefinite because "the intrinsic evidence teaches a microprocessor assembly performing a set of instructions (an algorithm)."  Dkt. No. 143 at 9.

Defendant responds that Plaintiff fails to identify any algorithm for performing the claimed function.  Dkt. No. 150 at 10.

Plaintiff replies that "[t]he Response again fails to recognize that the specification discloses the algorithm for moving between the states of operation." Dkt. No. 152 at 2. Further, Plaintiff argues that "the Response also appears to fail to recognize that according to the specification, the locking means' algorithm establishes a link to a user identification module, to facilitate the blocking means and timing means, because the blocking means and timing means check for a linked user identification module." *Id.* at 2–3.

At the January 10, 2020 hearing, Plaintiff reiterated its arguments that the specification discloses an algorithm.

(2) Analysis

Legal principles regarding 35 U.S.C. § 112, ¶ 6 are set forth above as to the "blocking means . . ." term.

This disputed term appears in dependent Claim 4 of the '654 Patent, which recites:

4. The mobile radiotelephony device of claim 1, further comprising:
      locking means for facilitating an activation of the block means by the timing means.

The parties agree on the claimed function. The parties dispute whether the specification discloses sufficient corresponding structure for performing the claimed function.

The specification discloses:

In FIG. 3 is represented a function flow chart of a device in accordance with the invention. This flow chart starts at box K1. In box K1 the device is in a state of availability, that is to say that the user has access to all the functions of the device. The user has the choice of either or not locking his device. This *locking* (L)/unlocking (UL) is done by accessing a configuration menu of the device. *When the user locks his device* (box K2), the identification module that is inside the device is automatically linked to the device. For this purpose, the device starts reading a data D1 in the identification module (for example, the international identification number IMSI) and he stores it in the random-access memory 24. Once *locked*, the device remains in the state of availability indicated in box K1. When the device is in the state of availability, one looks whether it is locked (box K3). If it is not locked (arrow N3), the device remains in the state of availability indicated in box

K1.  If it is *locked* (arrow Y3), one looks whether the identification module which is placed inside the device is the one that is linked to the device (box K4).

'654 Patent at 2:61–3:12 (emphasis added).

Although this disclosure refers to locking, the claimed function recites not just locking in general but rather "facilitating activation of the block means *by the timing means*," and Plaintiff fails to show how this disclosure "clearly links or associates" any structure to the claimed function. *Med. Instrumentation*, 344 F.3d at 1210 (citation omitted).  This lack of corresponding structure renders the limitation indefinite.  *See Noah*, 675 F.3d at 1319.

The Court therefore finds that **"locking means for facilitating an activation of the block means by the timing means"** is a means-plus-function term and the claimed function is **"facilitating an activation of the block means by the timing means,"** but lack of corresponding structure renders the term **indefinite**.

## J.  "connecting means for establishing a link between the mobile radiotelephony device and the linked user identification module"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| This term is governed by 35 U.S.C. § 112(6).<br><br>Function:<br>    "establishing a link between the mobile radiotelephony device and the linked user identification module"<br><br>Structure:<br>    "a device with a microprocessor assembly, and a common line, and a housing for a user identification module, the microprocessor assembly programmed to establish a link between the mobile radiotelephony device and the linked user identification module, or equivalents thereof" | Subject to 35 U.S.C. § 112, ¶ 6<br><br>Function:<br>    "establishing a link between the mobile radiotelephony device and the linked user identification module"<br><br>Structure:<br>    No corresponding structure for performing the claimed function is disclosed in the specification of the '654 patent.  This term is therefore indefinite. |

Dkt. No. 121, Ex. A at 4–5; Dkt. No. 143 at 9; Dkt. No. 153, Ex. A at 8–9. The parties submit that this term appears in Claim 5 of the '654 Patent. *Id.* at 8.

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "35 U.S.C. § 112, ¶ 6 applies / Function (agreed): 'establishing a link between the mobile radiotelephony device and the linked user identification module' / Structure: 'the mobile radiotelephony device implementing the following algorithm: reading data stored on the user identification module and storing it on the mobile radiotelephony device (1:66–2:10 & 2:66–3:6), and equivalents thereof.'"

At the January 10, 2020 hearing, Plaintiff had no objection to the Court's preliminary construction.

<u>(1) The Parties' Positions</u>

Plaintiff argues that this term is not indefinite because "the intrinsic evidence teaches an electrical diagram of a device with a microprocessor assembly performing a set of instructions (an algorithm)." Dkt. No. 143 at 9.

Defendant responds that "Uniloc's statement that the microprocessor 'is programmed' to perform the claimed function is insufficient," "Uniloc's reference to a 'common line' in Figure 3 has no relation to any algorithm for a microprocessor," and "Uniloc's reference to a housing indicates *where* the module resides; it does not teach how to achieve the claimed function." Dkt. No. 150 at 10–11.

Plaintiff replies:

> Here, the Response fails to recognize that the "common line" and a "housing" are both items of structure, along with the microprocessor. Moreover, while the specification discloses an algorithm . . ., "It is not necessary to disclose more structure when the functions of 'processing,' 'receiving,' and 'storing' are coextensive with the structure disclosed, i.e., a general purpose processor." *In re Katz Interactive Call Proc. Patent*, 639 F.3d 1303, 1316 (Fed. Cir. 2011). And

here, the connecting means is only required to read/write (receiving and processing) and store data from a user identification module.

Dkt. No. 152 at 3.

(2)  Analysis

Legal principles regarding 35 U.S.C. § 112, ¶ 6 are set forth above as to the "blocking means . . ." term.

This disputed term appears in dependent Claim 5 of the '654 Patent, which recites:

5.  The mobile radiotelephony device of claim 1, further comprising:
connecting means for establishing a link between the mobile radiotelephony device and the linked user identification module.

The parties agree on the claimed function.  The parties dispute whether the specification discloses sufficient corresponding structure for performing the claimed function.

The specification discloses:

In FIG. 1 is represented an electronic device in accordance with the invention.  In the example described here this device is a portable radiotelephone of the type used in cellular systems.  It notably comprises a microphone 5, a loudspeaker 6, a screen 8, a keypad 9 and an antenna 11.  The device 1 also comprises a *housing 12 intended for accommodating a user identification module 13*.  In the example of embodiment described here, this identification module 13 is a portable card of an integrated circuit in which information is stored, notably an international identification number currently called IMSI number, and a Personal Identification Number currently called PIN code.

FIG. 2 shows the overall electrical diagram of this device 1.  The operation of the device 1 is, in essence, controlled by a microprocessor assembly 20 which comprises a microprocessor ("µP") 22 to which are associated a random access memory ("RAM") 24 and a read-only memory ("ROM") 26.  This assembly is connected to a man-machine interface 30 via a common line 32.  This man-machine interface 32 controls the screen 8 and the keypad 9.  The common line 32 also connects the microprocessor assembly 20 to a transceiver assembly ("TX") 35 via an interface circuit 38.  The transceiver assembly 35 is connected to the antenna 11.  Finally, *the common line 32 also connects the microprocessor assembly 20 to a card reader 39*.

'654 Patent at 2:36–60 (emphasis added). This disclosure could perhaps be read as implying that the "housing 12," "common line 32," and "card reader 39" are structure for connecting the mobile radiotelephony device to a user identification module. *See id.*

Yet, corresponding structure must be "clearly link[ed] or associate[d]" with the claimed function. *Med. Instrumentation*, 344 F.3d at 1210 (citation omitted). Plaintiff identifies no such clear linkage or association between the claimed function and any of the above-mentioned structures, and none is apparent. To whatever extent Plaintiff maintains that the "*Katz*" exception is applicable, Plaintiff has not demonstrated that the "*Katz*" exception applies here. In particular, Plaintiff has not shown that the claimed function could be performed by any general-purpose computer. *See In re Katz*, 639 F.3d at 1316 ("Absent a possible narrower construction of the terms 'processing,' 'receiving,' and 'storing,' . . . those functions can be achieved by any general purpose computer without special programming.").

The Court determines that an algorithm is required for this microprocessor-implemented means-plus-function limitation. The '654 Patent provides that the link between the linked user identification module and the mobile device is established by taking data from the module and storing it on the device. The specification discloses:

> In a particularly simple embodiment, the connecting means comprise reading means and storage means of a data stored in the identification module, and the test means compare the thus stored data with the data stored in the identification module which is place[d] inside the device. The data stored is formed, for example, by the international identification number IMSI which is contained in the identification module (compare standards relating to the GSM radiotelephony systems). Thus, the identification module is automatically linked to the device without the intervention of the user, more particularly without the fact that a specific code has to be entered.

'654 Patent 1:66–2:10. The specification further discloses:

> This locking (L)/unlocking (UL) is done by accessing a configuration menu of the device. When the user locks his device (box K2), the identification module that is

inside the device is automatically linked to the device. For this purpose, the device starts reading a data D1 in the identification module (for example, the international identification number IMSI) and he stores it in the random-access memory 24.

*Id*. at 2:66–3:6.

The Court therefore finds that **"connecting means for establishing a link between the mobile radiotelephony device and the linked user identification module"** is a means-plus-function term, the claimed function is **"establishing a link between the mobile radiotelephony device and the linked user identification module,"** and the corresponding structure is **"the mobile radiotelephony device implementing the following algorithm: reading data stored on the user identification module and storing it on the mobile radiotelephony device (1:66–2:10 & 2:66–3:6), and equivalents thereof."**

## V. CONSTRUCTION OF DISPUTED TERMS IN U.S. PATENT NO. 8,194,632

The '632 Patent, titled "Method for Establishing Network Connections Between Stationary Terminals and Remote Devices Through Mobile Devices," issued on June 5, 2012, and bears an earliest priority date of September 7, 2004. The Abstract of the '632 Patent states:

A technique is provided for a seamless and transparent hand off from a user's mobile device to the user's stationary terminal of a network address of a remote device for the purpose of establishing a direct communication channel between the stationary terminal and a remote device, where the remote device first contacted the user's mobile device to initiate communications with the user.

## AA. "mobile device"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| "device meant to be portable in its ordinary use such as a mobile phone or tablet" | "smartphone, PDA, or other handheld device, as distinguished from a stationary terminal or web server" |

No. 2:18-CV-499, Dkt. No. 116, Ex. A at 1; Dkt. No. 143 at 11; Dkt. No. 150 at 14; No. 2:18-CV-499, Dkt. No. 141, Ex. A at 1. The parties submit that this term appears in Claims 1 and 8 of the '632 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "device that is handheld in its ordinary use." At the January 10, 2020 hearing, both parties accepted the Court's preliminary construction. *See also* '632 Patent at 2:51–56. To further reflect the understanding of the parties as apparent at the January 10, 2020 hearing, the construction should also clarify that the "device" is a "computing device."

The Court therefore construes **"mobile device"** to mean **"computing device that is handheld in its ordinary use."**

## BB. "stationary terminal"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "a device that is stationary"[2] | "a computer, such as a laptop, desktop, or workstation, that is larger than a mobile device and has a keyboard, mouse, or trackpad for input and text/graphic display for output" |

No. 2:18-CV-499, Dkt. No. 116, Ex. A at 1; Dkt. No. 143 at 10; Dkt. No. 150 at 11; No. 2:18-CV-499, Dkt. No. 141, Ex. A at 1. The parties submit that this term appears in Claims 1 and 8 of the '632 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "device that is not handheld in its ordinary use."

---

[2] Plaintiff previously proposed: "a computer, such as a laptop, desktop, or workstation, that is larger than a mobile device." No. 2:18-CV-499, Dkt. No. 116, Ex. A at 1.

At the January 10, 2020 hearing, Plaintiff agreed with the Court's preliminary construction.

<u>(1)  The Parties' Positions</u>

Plaintiff submits that its proposed construction "is precisely how the specification identifies the term."  Dkt. No. 143 at 10.  Plaintiff also argues that, during an *inter partes* review ("IPR") of a related patent, the Patent Trial and Appeal Board ("PTAB") "expressly rejected the exact limitation Defendant seeks to import."  *Id.* at 10–11 (emphasis omitted).

Defendant responds: "The Court should adopt Google's construction because it is faithful to the claim language, which recites a 'stationary *terminal*,' not merely any 'device' that is stationary.  Plainly, a 'terminal' is a computer with which a human interacts—i.e., configured for human input and output, and typically larger than a mobile device."  Dkt. No. 150 at 11.  Defendant also cites statements by Plaintiff in *Inter Partes* Review proceedings as to a continuation of the '632 Patent.  *Id.* at 12.  Further, Defendant argues that "Uniloc replaces the word 'terminal' with 'device,' but the patent does not use those terms interchangeably, and Uniloc cites no support in the intrinsic or extrinsic record demonstrating that they are synonymous or that any 'device,' a broad and general term, would be the 'terminal' of the '632 patent."  *Id.* at 13.  Finally, Defendant submits that "the patent consistently refers to 'mobile devices' and 'stationary terminals' in a mutually exclusive manner."  *Id.*

Plaintiff replies:

> [T]he specification does not limit "stationary terminal" to a class of computers, rather the specification expressly distinguishes the term "mobile device" and "stationary terminal" based on whether the device is moving.  For example, a laptop is also a mobile device because a laptop can be moved by a user to nearly every place a user goes.  And a mobile phone may become a "stationary terminal" for example, if it is plugged in to the wall and is being used as a stationary device."

Dkt. No. 152 at 4.

At the January 10, 2020 hearing, Defendant argued that the Court's preliminary construction fails to give effect to the word "terminal." Defendant also argued that for a stationary terminal to be focused on by a user, as contemplated by the specification, the terminal must have a display. Likewise, Defendant argued that for a user to want to not be distracted from interacting with the stationary terminal, the terminal must have an input device.

(2) Analysis

Claim 1 of the '632 Patent, for example, recites (emphasis added):

1. A method for establishing a data communications session between a *stationary terminal* and a remote device, the method comprising:

establishing a communication link through a short-range wireless technology between the *stationary terminal* and a proximate mobile device wherein the proximate mobile device operates within a cellular wireless network system;

transmitting, by the *stationary terminal*, an invitation message comprising a network address relating to the *stationary terminal* and a remote device identifier to the proximate mobile device through the established communication link, whereupon the proximate mobile device establishes communication with the remote device using the remote device identifier and provides the network address of the *stationary terminal* to the remote device; and

establishing a connection between the *stationary terminal* and the remote device for data communications based upon an initial communication by the remote device through use of the network address of the *stationary terminal* provided to the remote device by the proximate mobile device.

Defendant cites statements by the patentee during IPR proceedings as to a continuation of the '632 Patent, namely United States Patent No. 8,369,298 ("the '298 Patent"):

The examples given of laptops, desktops, and workstations have *common characteristics*, such as a CPU, keyboard (physical or virtual), mouse or track pad (which may be integrated with a touchscreen display), text and graphics display, and the ability to communicate through written text such as in an instant message ("IM") session, *that define a class of computing devices readily understood to one of skill in the art*. The identification of this class of devices in the '298 patent itself—computers, such as laptops, desktops, or workstations, that are larger than a mobile device—provides the proper construction of the claim term "stationary terminal."

* * *

> [T]he class of devices identified as stationary terminals—laptop, desktop, workstation, etc.—all have more than a "user interface" broadly understood, but have keyboards and a mouse or track pad for input, and text/graphic displays for output. A device without such a user interface would not be a "stationary terminal" within the meaning established by the description in the '298 patent.

Dkt. No. 150, Ex. 7, IPR2019-00918, Patent Owner Preliminary Response to Petition Pursuant to 37 C.F.R. § 42.107(a) at 9–10 & 13 (emphasis added).

Plaintiff cites *Oyster Optics*, arguing that because the '298 Patent is a child of the '632 Patent, any disclaimer regarding the '298 Patent cannot be applied to the parent '632 Patent. *See Oyster Optics, LLC v. Coriant Am. Inc.*, No. 2:16-CV-1302-JRG, 2018 WL 7019353, Dkt. No. 304, slip op. at 5 (E.D. Tex. Mar. 2, 2018) ("the Court will not transform a specific disclaimer by claim amendment of a child application into a broader, binding commentary on the scope of an entire patent family absent 'clear[ ]' intent") (quoting *Microsoft Corporation v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004)). In *Oyster Optics*, the Court noted that "the disclaimer was not directed at 'the specification' as in *Microsoft*." No. 2:16-CV-1302, Dkt. No. 304, slip op. at 5 (discussing *Microsoft*, 357 F.3d at 1349).

*Oyster Optics* is distinguishable, however, because here the patentee referred to "the meaning established by the description in the '298 patent." Dkt. No. 150, Ex. 7, Patent Owner Preliminary Response to Petition Pursuant to 37 C.F.R. § 42.107(a) at 13. Because the '298 Patent is a continuation of the '632 Patent, these patents share the same written description. The above-reproduced definitive statements by the patentee regarding the '298 Patent are therefore also relevant to the '632 Patent.

Yet, in its Decision Granting Institution of *Inter Partes* Review, the Patent Trial and Appeal Board expressly rejected the patentee's arguments, stating:

> In rejecting Patent Owner's proposal, we determine that a "terminal" is not limited to a specific subclass of computers "such as a laptop, desktop, or workstation, that

is larger than a mobile device."  Moreover, we do not interpret the term "terminal" to require a user interface that enables the user to use the terminal, instead of the mobile device, for data communications when the user's attention is directed to the terminal.  Nor must a "terminal" have an interface that includes "keyboards and a mouse or track pad for input, and text/graphic displays for output."

Dkt. No. 143, Ex. 4, Oct. 16, 2019 Decision at 20; *see id.* at 18.

The Court therefore rejects Defendant's proposed construction.  *See Vertical Tank, Inc. v. BakerCorp*, No. 1:18-CV-145-LJO-JLT, 2019 WL 2207668, *11–*12 (E.D. Cal. May 22, 2019) (". . . [c]ourts have refused to find a disclaimer was made when the purported disclaimer was *rejected* by the patent office") (citing four district court decisions across four separate districts); *see, e.g., Abbott Labs. & Surmodics, Inc. v. Church & Dwight Co., Inc.*, No. 07 C 3428, 2008 WL 5387848, at *8 (N.D. Ill. Dec. 22, 2008) (discussing *Microsoft*, 357 F.3d at 1350, and stating: "Finding disclaimer based on statements ignored by a patent examiner is not, however, the same as finding disclaimer based on a proposed claim construction that the PTO expressly rejected.").[3]

Defendant also submits a technical dictionary definition of "terminal" as meaning: "In networking, a device consisting of a video adapter, a monitor, and a keyboard."  Dkt. No. 150, Ex. 5, *Microsoft Computer Dictionary* 515 (5th ed. 2002).  Although this definition is consistent with Defendant's proposal of requiring "a keyboard, mouse, or trackpad for input and text/graphic display for output," importing these limitations into the construction would "risk[] transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification."  *Phillips*, 415 F.3d at 1321.

---

[3] Defendant cites purportedly contrary authority that states "the interested public has the right to rely on the inventor's statements made during prosecution, without attempting to decipher whether the examiner relied on them, or how much weight they were given." *Fenner Investments, Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1325 (Fed. Cir. 2015).  This authority is inapplicable here because the PTAB expressly rejected the interpretation upon which Defendant proposes to rely.

Turning to the specification, the specification refers to "stationary terminals" as being relatively more stationary as compared to mobile devices:

> The present invention relates generally to messaging techniques for mobile devices, and more specifically, a technique for transferring network addresses from mobile devices to *more stationary terminals such as laptops, desktops and workstations* in order to establish communication with remote devices (i.e., either mobile devices or stationary terminals).

'632 Patent at 1:25–31 (emphasis added); *see id.* at 5:5 ("stationary terminal (e.g., laptop, desktop, workstation, etc.)").

> [W]hen a user is actively engaged or focused at a *more stationary terminal, such as a laptop, desktop or work station*, diverting his attention from the stationary terminal in order to answer or otherwise use his mobile device (e.g., smartphones) for communications purposes or to receive or send data becomes inconvenient.

*Id.* at 1:44–49 (emphasis added); *see id.* at 4:29–30 ("once a user has stopped moving and is focused on a stationary terminal such as the laptop 125"); *see also id.* at 2:64 ("a stationary terminal or laptop 125"), 3:1–2 ("stationary terminal 125"), 3:5 ("laptop 125"), 5:45–46 ("stationary terminal 125") & 5:49 ("laptop 125").

In light of these disclosures, a "stationary terminal" is a device that is less portable than a mobile device. Also of note, a laptop is portable, but the specification nonetheless refers to a laptop as an example of a "stationary terminal." *See, e.g.,* '632 Patent at 1:25–31. Further, the specification refers to transitioning "from being mobile to being stationary":

> [W]hat is needed is a technique to utilize the broadband networks accessible by stationary terminals for communications that are initiated through mobile devices using wireless cellular telephone radio technologies in order to provide smoother integration *from being mobile to being stationary*.

*Id.* at 1:56–61 (emphasis added).

In this context, and in light of the above-cited statements regarding being relatively "more stationary," the term "stationary terminal" should be construed not in terms of whether a device is

moving but rather in terms of not being handheld.  This comports with the context provided by the claims, such as the recital in above-reproduced Claim 1 of the '632 Patent regarding communication "between the stationary terminal and a proximate mobile device."  This also comports with the now-agreed construction of "mobile device" (addressed above).  Finally, Plaintiff's proposal of "a device that is stationary" would create confusion because, as Defendant argues, "a device may be stationary at some times but moving at others."  Dkt. No. 150 at 14.

The Court therefore construes **"stationary terminal"** to mean **"computing device that is not handheld in its ordinary use."**

CC.  **"short-range wireless technology"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| "wireless local area network" | "wireless communication technology, such as Bluetooth, that creates a personal area network between devices; not Wi-Fi" |

No. 2:18-CV-499, Dkt. No. 116, Ex. A at 1; Dkt. No. 143 at 14; Dkt. No. 150 at 15; No. 2:18-CV-499, Dkt. No. 141, Ex. A at 1–2.  The parties submit that this term appears in Claims 1, 2, 9, and 16 of the '632 Patent.  *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "wireless personal area network technology."

(1)  The Parties' Positions

Plaintiff argues that there is no support for Defendants' proposal of excluding Wi-Fi and, moreover, "the specification expressly *includes* and contemplates the use of Wi-Fi along with other technologies such as Bluetooth."  Dkt. No. 143 at 14.

Defendant responds that "the patent's only example of a short-range wireless technology is Bluetooth," and "as explained by the unrebutted testimony of Google's expert, Dr. Laneman,

the ordinary meaning of 'short-range wireless technology' to a skilled artisan at the time of the patent would include personal area networks such as Bluetooth but would not include wireless local area networks such as Wi-Fi." *Id.* at 15. Defendant also argues that "Uniloc's construction should be rejected because it directly contradicts the specification and claims by excluding the preferred (and only) embodiment of Bluetooth." *Id.* at 17.

Plaintiff replies that "the extrinsic evidence cited [by Defendant] does not even address the same technology, instead the extrinsic evidence [is] directed to 'personal' wireless technologies." Dkt. No. 152 at 5. Plaintiff also argues that "the Response does not rebut that the specification is expressly *inclusive*, nor does the Response rebut that Wi-Fi *can* be used in place of Bluetooth." *Id.*

At the January 10, 2020 hearing, Plaintiff argued that there is no fundamental difference between Bluetooth and WiFi. Plaintiff cited Defendant's own Exhibit D, § 2.1, second paragraph, as evidence that simply increasing the Bluetooth power level can achieve the same range as WiFi. *See* Dkt. No. 150, Ex. 9, Ex. D, Jiajun Jim Chen, et al., *Short-Range Wireless Technologies with Mobile Payment Systems* at § 2.1 (p. 62 of 100 of Ex. 9) ("Bluetooth operates at a short distance— up to 10 meters. By increasing the transmission power to 100 mW, the range can theoretically be extended to 100 meters."). Defendant responded that the Bluetooth and WiFi are not substitutable because the range of WiFi is too large for the stated purpose of determining proximity. Plaintiff replied that proximity could be determined based on signal strength. Plaintiff also argued that there could be many purposes, aside from determining proximity, for establishing communication between a mobile device and a stationary terminal.

(2) Analysis

Claims 1 and 2 of the '632 Patent, for example, recite (emphasis added):

1.  A method for establishing a data communications session between a stationary terminal and a remote device, the method comprising:

       establishing a communication link through a *short-range wireless technology* between the stationary terminal and a proximate mobile device wherein the proximate mobile device operates within a cellular wireless network system;

       transmitting, by the stationary terminal, an invitation message comprising a network address relating to the stationary terminal and a remote device identifier to the proximate mobile device through the established communication link, whereupon the proximate mobile device establishes communication with the remote device using the remote device identifier and provides the network address of the stationary terminal to the remote device; and

       establishing a connection between the stationary terminal and the remote device for data communications based upon an initial communication by the remote device through use of the network address of the stationary terminal provided to the remote device by the proximate mobile device.

2.  The method of claim 1 wherein the short-range wireless technology is *Bluetooth*.

Dependent Claims 9 and 16 similarly recite that "the short-range wireless technology is Bluetooth." The doctrine of claim differentiation therefore weighs against limiting the "short-range wireless technology" to Bluetooth. *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). Indeed, Defendant's proposed construction includes "Bluetooth" as an example rather than a limitation.

Plaintiff proposes that the term "short-range wireless technology" means "wireless local area network," but Defendant persuasively demonstrates that "Wireless Local Area Network (WLAN)" is a well-known term and does not encompass Bluetooth. *See* Dkt. No. 150, Ex. 9, Laneman Decl. at ¶¶ 35–36. The specification and the above-cited dependent claims repeatedly refer to Bluetooth as an example of a "short-range wireless technology," so Plaintiff's proposal, which would exclude Bluetooth, is disfavored. *See, e.g., Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1364 (Fed. Cir. 2019).

In opining that the disputed term has been understood in the relevant art as excluding WiFi, Defendant's expert cites various technical writings in the art. *See* Dkt. No. 150, Ex. 9, Laneman Decl. at ¶¶ 18–36. For example, Defendant's expert submits an article that contrasts different characteristics of "Wireless Personal Area Network (WPAN)" technologies such as Bluetooth and "Wireless Local Area Network (WLAN)" technologies such as Wi-Fi. *See id.*, Ex. G, Michelle Man, *Bluetooth and Wi-Fi* at 2. Defendant fails to demonstrate, however, that the term "short-range wireless technology" has any well-established meaning in the relevant art.

The Court therefore turns to the specification. *See Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1315) ("Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification.").

The specification refers to Bluetooth as an example of a "short-range wireless technology":

> FIG. 2 depicts a flow chart for establishing a network connection between a stationary terminal and an initiating remote device through a mobile device in accordance with the present invention. Initially, in steps 205 and 210, when the user carrying mobile device 110 has focused his attention to his laptop 125 and the mobile device 110 is within sufficient short-range proximity to the laptop 125, the mobile device 110 and the laptop 125 discover each other's existence and automatically establish a Bluetooth (or other short-range wireless technology) communication link in support of an IM application (or any other data transfer application) related to a particular Bluetooth service.

'632 Patent at 3:17–28; *see id.* at 2:5–6, 2:19–20, 2:61–62, 4:41–42 & 5:1-2.

Plaintiff cites disclosure that refers to Bluetooth and Wi-Fi as examples of "services and protocols":

> While the foregoing detailed description has described the present invention using SMS, GPRS, TCP/IP, Bluetooth, *Wi-Fi* and IM, other similar services and protocols may be used in a variety of similar environments in which the present invention may be implemented.

'632 Patent at 5:57–61 (emphasis added).  This disclosure does not, however, state that Bluetooth and Wi-Fi are interchangeable or that the term "short-range wireless technology" could cover either or both.

The specification contrasts "short-range wireless technology" with other types of communication:

> *Mobile device 110 also supports a short-range wireless technology such as Bluetooth.*  For example, mobile device 110, playing the role of a Bluetooth client or slave, discovers that a stationary terminal or laptop 125 within short-range proximity is playing the role of a Bluetooth server or master and is advertising as Bluetooth service relating to an IM communication application.  In accordance with the Bluetooth specification, the mobile device 110 and the stationary terminal 125 establish a communication link or a piconet 130.  Those skilled in the art will recognize that establishing a Bluetooth communications link between the mobile device 110 and the laptop 125 may be implemented in a variety of ways (i.e., not necessarily with mobile device 110 serving as slave and the laptop 125 serving as master) that are all considered to be within the scope of the present invention.

> The laptop 125 also supports access to the Internet 120.  In the embodiment of an environment for the present invention depicted in FIG. 1, *the laptop's 125 access to the Internet is implemented through the use of an IEEE 802.11 or Wi-Fi router 135 connected to broadband access to the Internet 120*, although those skilled in the art will recognize that the laptop's 125 access to the Internet can be implemented in a variety [of] known techniques.

*Id.* at 2:61–3:16 (emphasis added); *see id.* at 4:17–19 ("the laptop's wireless connection to Wi-Fi router 135 and ultimately through the Internet 120"); *see also id.* at Fig. 1.

The disclosures regarding "short-range wireless technology" between a mobile device and a stationary terminal thus contrast with the disclosure of "access to the Internet" using WiFi.  *Id.* at 2:61–3:16.  Above-reproduced Claim 1 reinforces that there are distinctions between communication technologies, reciting that "the proximate mobile device operates within a cellular wireless network system."  Defendant persuasively shows that Bluetooth is an example of the well-known "Wireless Personal Area Network (WPAN)" category of communication technologies.  *See* Dkt. No. 150, Ex. 9, Laneman Decl. at ¶¶ 35–36.  On balance, read in light of the above-discussed

disclosures in the specification (and in the absence of any well-established meaning in the relevant art), the term "short-range wireless technology" refers to wireless personal area network technology. *See Intervet*, 617 F.3d at 1287.

The Court therefore construes **"short-range wireless technology"** to mean **"wireless personal area network technology."**

**DD.  "transmitting, by the stationary terminal, an invitation message comprising a network address relating to the stationary terminal and a remote device identifier to the proximate mobile device through the established communication link, whereupon the proximate mobile device establishes communication with the remote device"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | The proximate mobile device initiates a connection with the remote device based on an invitation message received from the stationary terminal through the established communication link that includes a network address relating to the stationary terminal and a remote device identifier. |

No. 2:18-CV-499, Dkt. No. 116, Ex. A at 1; Dkt. No. 143 at 15.  Plaintiff submits that this term appears in Claim 1 of the '632 Patent.  *Id.*

Plaintiff argues that "Defendant's proposed construction only adds confusion and misunderstanding."  Dkt. No. 143 at 15.

Defendant responds:

Google proposed a clarifying construction for the term "transmitting, by the stationary terminal…" that was not intended to alter its plain and ordinary meaning. Google disagrees with Uniloc's assertion that its proposed construction "injected uncertainty" (Op. Br. at 15), but is no longer seeking construction of this term.

Dkt. No. 150 at 11 n.3.  Also, this term does not appear in the parties' December 26, 2019 P.R. 4-5(d) Joint Claim Construction Chart.  *See* No. 2:18-CV-499, Dkt. No. 141 at Ex. A.

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the Court's preliminary finding that this term should be given its plain meaning. Neither party objected to this preliminary finding.

Based on the foregoing, the Court construes **"transmitting, by the stationary terminal, an invitation message comprising a network address relating to the stationary terminal and a remote device identifier to the proximate mobile device through the established communication link, whereupon the proximate mobile device establishes communication with the remote device"** to have its **plain meaning**.

## EE. "the established communication link"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "established communication link" refers to the communication link established between the stationary terminal and the proximate mobile device through a short-range wireless technology |

No. 2:18-CV-499, Dkt. No. 116, Ex. A at 2; *see* Dkt. No. 143 at 15–16. Plaintiff submits that this term appears in Claim 1 of the '632 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "The antecedent basis for 'the established communication link' in Claim 1 of the '632 Patent is 'establishing a communication link through a short-range wireless technology between the stationary terminal and a proximate mobile device.'"

At the January 10, 2020 hearing, both parties accepted the Court's preliminary construction. The Court expressly finds that **the antecedent basis for "the established communication link" in Claim 1 of the '632 Patent is "establishing a communication link**

**through a short-range wireless technology between the stationary terminal and a proximate**

**mobile device."**

**FF. "causes the processor to establish a data communications session between the stationary terminal and a remote mobile device, by performing all the steps of claim 1"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not indefinite | Indefinite under 35 U.S.C. § 112 |

No. 2:18-CV-499, Dkt. No. 116, Ex. A at 2; Dkt. No. 143 at 16; No. 2:18-CV-499, Dkt. No. 141, Ex. A at 2. The parties submit that this term appears in Claim 8 of the '632 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [(]Not indefinite[)]."

At the January 10, 2020 hearing, Plaintiff agreed with the Court's preliminary construction.

(1) The Parties' Positions

Plaintiff argues that "given the full context, Claim 8 is written in a Beauregard claim format (*In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995)), reciting a non-transitory computer-readable medium that includes instructions, that may be executed by a processor of a stationary terminal, to establish a data communications session between the stationary terminal and a remote mobile terminal by performing all the steps of claim 1." Dkt. No. 143 at 16. Plaintiff also argues that "to the extent Defendant may argue that the claim language requires that a single processor – 'a processor of a stationary terminal' – must perform all of the steps of Claim 1, Defendant is wrong." *Id.*

Defendant responds that "[t]h[is] claim[] [is] invalid because [it] claim[s] both a physical apparatus and method steps and also because [it] do[es] not narrow the scope of independent claim 1." Dkt. No. 150 at 18. Also, Defendant argues, this claim is invalid because it is a dependent

claim that, rather than narrowing the claim from which it depends, "recite[s] entirely different subject matter."  *Id.* at 19.

Plaintiff replies that "Claims 8 and 15 use functional language (from claim 1) to describe a claimed apparatus."  Dkt. No. 152 at 5.

(2)  Analysis

Defendant submits the general principle that a claim cannot "combine[] two statutory classes of invention."  *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335 (Fed. Cir. 2014).  Indeed, "[a] single patent may include claims directed to one or more of the classes of patentable subject matter, but no single claim may cover more than one subject matter class." *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008) (citing *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) (holding indefinite a claim covering both an apparatus and a method of using that apparatus)); *see In re Katz*, 639 F.3d at 1318 (claims reciting "interface means for providing automated voice messages . . . to certain of said individual callers, wherein said certain of said individual callers digitally enter data" found indefinite because the claims "create confusion as to when direct infringement occurs because they are directed both to systems and to actions performed by 'individual callers'").

Defendant also argues that Claim 8 is an improper dependent claim.  *See Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1291 (Fed. Cir. 2006) ("We recognize that the patentee was attempting to claim what might otherwise have been patentable subject matter.  Indeed, claim 6 could have been properly drafted either as dependent from claim 1 or as an independent claim— i.e., 'the hemicalcium salt of atorvastatin acid.'  But, we should not rewrite claims to preserve validity.") (citations, internal quotation marks, and footnote omitted); *see also Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1362 (Fed. Cir. 2016).

Claim 8 of the '632 Patent refers back to Claim 1, and Claims 1 and 8 recite (emphasis added):

1. A *method* for establishing a data communications session between a stationary terminal and a remote device, the method comprising:

establishing a communication link through a short-range wireless technology between the stationary terminal and a proximate mobile device wherein the proximate mobile device operates within a cellular wireless network system;

transmitting, by the stationary terminal, an invitation message comprising a network address relating to the stationary terminal and a remote device identifier to the proximate mobile device through the established communication link, whereupon the proximate mobile device establishes communication with the remote device using the remote device identifier and provides the network address of the stationary terminal to the remote device; and

establishing a connection between the stationary terminal and the remote device for data communications based upon an initial communication by the remote device through use of the network address of the stationary terminal provided to the remote device by the proximate mobile device.

* * *

8. A non-transitory computer-readable medium including instructions that, when executed by a processor of a stationary terminal, causes the processor to establish a data communications session between the stationary terminal and a remote mobile device, by *performing all the steps of claim 1.*

Claim 8 refers back to the Claim 1 method steps as a shorthand and thus has the typical form of a "Beauregard" claim. *See CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1287 (Fed. Cir. 2013) ("named for *In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995) . . . [c]laims in *Beauregard* format formally recite a tangible article of manufacture—a computer-readable medium, such as a computer disk or other data storage device—but such claims also require the device to contain a computer program for directing a computer to carry out a specified process").

Defendant fails to show that referring back to the steps of Claim 1 warrants finding any departure from the *Beauregard* claim format. Moreover, Defendant fails to establish that Claim 8 is "in dependent form." 35 U.S.C. § 112, ¶ 4 ("[A] claim in dependent form shall contain a

reference to a claim previously set forth and then specify a further limitation of the subject matter claimed.").

At the January 10, 2020 hearing, Defendant argued that Claim 8 is also indefinite because it incorporates steps that must be performed by devices other than the stationary terminal recited by Claim 8. In particular, Defendant pointed to "the proximate mobile device establishes communication with the remote device" and "an initial communication by the remote device." Plaintiff replied that the claim does not require actual performance of any of the operations cited by Defendant. The Court agrees with Plaintiff. The language cited by Defendant relates to configuration and environmental requirements. *Cf. HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1274 (Fed. Cir. 2012).

The Court therefore expressly rejects Defendant's indefiniteness argument, and no further construction is necessary. *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015).

The Court accordingly construes **"causes the processor to establish a data communications session between the stationary terminal and a remote mobile device, by performing all the steps of claim 1"** to have its **plain meaning**.

## GG. "the computer system comprising a processor configured to perform all the steps of claim 1"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not indefinite | Indefinite under 35 U.S.C. § 112 |

No. 2:18-CV-499, Dkt. No. 116, Ex. A at 2; Dkt. No. 143 at 17; No. 2:18-CV-499, Dkt. No. 141, Ex. A at 2. The parties submit that this term appears in Claim 15 of the '632 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [(]Not indefinite[)]."

At the January 10, 2020 hearing, Plaintiff agreed with the Court's preliminary construction.

(1) The Parties' Positions

Plaintiff argues that "given the full context, Claim 15 recites a computer system comprising a processor configured to be capable of performing the steps of Claim 1." Dkt. No. 143 at 17. Plaintiff also argues that "[t]o the extent Defendant argues that the claim language requires that a single processor – 'the computer system comprising a processor' – perform all of the steps of Claim 1, Defendant is wrong." *Id.*

Defendant responds as to this term together with Defendant's arguments as to Claim 8 (discussed above). *See* Dkt. No. 150 at 17–19.

Plaintiff replies that "Claims 8 and 15 use functional language (from claim 1) to describe a claimed apparatus." Dkt. No. 152 at 5.

(2) Analysis

Claim 15 of the '632 Patent depends from Claim 1 and recites (emphasis added):

15. A computer system configured to initiate a data communications session with a remote device, the computer system comprising a processor configured to *perform all the steps of claim 1*.

Substantially the same analysis applies to this disputed term as discussed above for the term "causes the processor to establish a data communications session between the stationary terminal and a remote mobile device, by performing all the steps of claim 1" in Claim 8 of the '632 Patent. Finally, at the January 10, 2020 hearing, Defendant argued that Claim 15 is also indefinite

because it incorporates steps that must be performed by devices other than the computer system recited in Claim 15. The Court rejects Defendant's argument for the same reason discussed above as to Defendant's similar argument regarding Claim 8.

The Court therefore expressly rejects Defendant's indefiniteness argument, and no further construction is necessary. *See O2 Micro*, 521 F.3d at 1362; *see also Finjan*, 626 F.3d at 1207; *Summit 6*, 802 F.3d at 1291.

The Court accordingly construes **"the computer system comprising a processor configured to perform all the steps of claim 1"** to have its **plain meaning**.

## VI. CONSTRUCTION OF DISPUTED TERMS IN U.S. PATENT NO. 8,407,609

The '609 Patent, titled "System and Method for Providing and Tracking the Provision of Audio and Visual Presentations via a Computer Network," issued on March 26, 2013, and bears an earliest priority date of August 21, 2008. The Abstract of the '609 Patent states:

> A method for tracking digital media presentations: providing a corresponding web page for each digital media presentation to be delivered; providing identifier data to the user's computer; providing a timer applet to the user's computer; and, storing data indicative of received identifier data; wherein each provided webpage causes corresponding digital media presentation data to be streamed from a second computer system distinct from a first computer system directly to the user's computer independent of the first computer system; and stored data is indicative of an amount of time the digital media presentation data is streamed from the second computer system to the user's computer.

### AAA. "web page" / "webpage"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>     "document provided by a web server having content displayed by a web browser"[4] | "HTML file identified by a web address that is sent by a web server" |

---

[4] Plaintiff previously proposed: "content displayed by a web browser." Dkt. No. 143 at 18.

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 1; Dkt. No. 143 at 18; Dkt. No. 150 at 20; No. 2:18-CV-502, Dkt. No. 140, Ex. A at 1. The parties submit that this term appears in Claim 1 of the '609 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "a document identified by a web address."

At the January 10, 2020 hearing, Plaintiff agreed with the Court's preliminary construction.

(1) The Parties' Positions

Plaintiff argues that whereas Defendant's proposal "seeks to limit the claim language by requiring the web page be in a specific format – an 'HTML file' (as opposed to other formats) and be identified by a 'web address,'" "the specification does not once mention the term 'HTML' or 'address' or 'web address.'" Dkt. No. 143 at 19.

Defendant responds that Plaintiff's proposed interpretation "improperly conflates 'content' with the 'web page' itself." Dkt. No. 150 at 20.

Plaintiff replies: "[A] web page is content that has been aggregated. Defendant's arguments regarding the claim language also fails, precisely because the web page aggregates content, and the *web browser* displays the aggregated content (web page). And there is nothing to prevent content (such as an applet) to stream other content." Dkt. No. 152 at 6.

(2) Analysis

Claim 1 of the '609 Patent recites (emphasis added):

1. A method for tracking digital media presentations delivered from a first computer system to a user's computer via a network comprising:
    providing a corresponding *web page* to the user's computer for each digital media presentation to be delivered using the first computer system;
    providing identifier data to the user's computer using the first computer system;

providing an applet to the user's computer for each digital media presentation to be delivered using the first computer system, wherein the applet is operative by the user's computer as a timer;

receiving at least a portion of the identifier data from the user's computer responsively to the timer applet each time a predetermined temporal period elapses using the first computer system; and

storing data indicative of the received at least portion of the identifier data using the first computer system;

wherein each provided *webpage* causes corresponding digital media presentation data to be streamed from a second computer system distinct from the first computer system directly to the user's computer independent of the first computer system;

wherein the stored data is indicative of an amount of time the digital media presentation data is streamed from the second computer system to the user's computer; and

wherein each stored data is together indicative of a cumulative time the corresponding *web page* was displayed by the user's computer.

The specification discloses:

Referring still to FIG. 2, the particularly illustrated web page 200 includes a category selector 205, a ranking selector 210, a new content indicator 215, a content type indicator 220, a page selector 225, particular content graphics 230, particular content type indicators 235 and particular content information 240 organized under a browser tab 245. Web page 200 may take other forms and/or present different content as is conventionally achieved in the pertinent arts.

* * *

Referring now to FIG. 3, there is shown a view of web page 200 when tab 250 is selected. In the illustrated embodiment of FIG. 3, web page 200 includes a text box 255 and search button 260 under tab 250. In certain embodiments of the present invention, when tab 250 is selected, text box 255 and search button 260 may be presented on the user's computer 20 by server 34. A user may enter a search term into window 255 in a conventional manner. A user may then activate search button 260 in a conventional manner. Responsively thereto, content server 34 may request database server 32 identify which presentations should be used to populate page 200 according to the entered search term(s). Server 34 may then provide such a populated page 200 to the requesting user computer 20.

'609 Patent at 4:28–35 & 5:26–39.

Also, Defendant cites the following disclosure:

In certain embodiments of the present invention, when a user selects a category in selector 205, content server 34 may request database server 32 identify which

presentations should be used to populate page 200 according to the selected category. Server 34 may then provide such a populated page 200 to the requesting user computer 20.

*Id.* at 4:63–5:1; *see id.* at 8:49–51 ("Illustrated system 10 includes a database server 32, a content or web server 34 and a file server 36, all by way of non-limiting example only.").

The specification thus contemplates that a "web page" is sent by a server to a user's computer. Nonetheless, Defendant fails to identify any basis in the claim language or the specification for requiring that a "web page" must be an HTML (Hypertext Markup Language) file. Indeed, the specification contains no disclosure of HTML at all. In light of this absence of intrinsic evidence to support Defendant's proposed HTML limitation, the opinions of Defendant's expert in this regard, as to web pages being limited to HTML, are unpersuasive. *See* Dkt. No. 150, Ex. 14, Nov. 5, 2019 Houh Decl. at ¶ 46; *see also id.* at ¶¶ 24–28.

Defendant submits extrinsic technical dictionary definitions of "web page" as meaning "[a] hypertext document on the World Wide Web" or "[a]n HTML document on the web." Dkt. No. 150, Ex. 12, *Oxford Dictionary of Computing* 554 (6th ed. 2008); *id.*, Ex. 13, *Newton's Telecom Dictionary* 1014 (24th ed. 2008). In light of the absence of intrinsic evidence to support Defendant's proposed HTML limitation, this extrinsic evidence is unpersuasive. At the January 10, 2020 hearing, Defendant pointed to the disclosure in the specification of "RSS feeds," arguing that an RSS feed is identified by a web address but is not a "web page." *See* '609 Patent at 10:6–24. Defendant presented no evidence to support its argument that a person of ordinary skill in the art would interpret "web page" as excluding RSS feeds. Indeed, Defendant's expert did not address RSS feeds. *See* Dkt. No. 150, Ex. 14, Nov. 5, 2019 Houh Decl. at ¶¶ 42–48. Defendant thus failed to persuasively support its contention that the Court's preliminary

construction encompasses documents that do not fit the common understanding of the term "web page" in the relevant art.

Nonetheless, the context in which "web page" appears in above-reproduced Claim 1 of the '609 Patent is consistent with Defendant's proposal that a "web page" is a particular document rather than "content," such as the recital of "*providing* a corresponding web page to the user's computer *for each digital media presentation* to be delivered using the first computer system." This understanding is also consistent with disclosure in the specification that distinguishes between a "web page" and "content." *See* '609 Patent at 4:25–27 ("Illustrated web page 200 aggregates audio and/or video content for presentation to users of computers 20."). Finally, whereas Plaintiff's proposal refers only to how a "web page" may be provided and displayed, Defendant's proposal of "identified by a web address" gives effect to "web" in the disputed terms.

The Court accordingly construes **"web page"** and **"webpage"** to mean **"a document identified by a web address."**

**BBB. "wherein each provided webpage causes [wherein each provided webpage causes corresponding digital media presentation data to be streamed]"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| This term cannot be separated from its contextual limitations and should be considered as part of the claim limitation: "wherein each provided webpage causes corresponding digital media presentation data to be streamed from a second computer system distinct from the first computer system directly to the user's computer independent of the first computer system", and should receive its plain and ordinary meaning. | "wherein each provided HTML file includes and executes the instructions to"[5]<br><br>"wherein each provided webpage causes corresponding digital media presentation data to be streamed":<br>    "wherein each provided HTML file includes and executes the instructions to stream the corresponding digital media presentation data" |

---

[5] Defendant also previously proposed: "wherein each provided HTML file includes and executes the instructions for the."  No. 2:18-CV-502, Dkt. No. 111, Ex. A at 1.

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 1; Dkt. No. 143 at 19; Dkt. No. 150 at 20; No. 2:18-CV-502, Dkt. No. 140, Ex. A at 1–2. The parties submit that this term appears in Claim 1 of the '609 Patent. *Id.* at 1.

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [(]Expressly reject Defendant's proposals of 'HTML' and 'includes and executes . . . instructions'[)]."

At the January 10, 2020 hearing, apart from the above-discussed dispute regarding the constituent term "web page," neither party objected to the Court's preliminary construction. *See also* '609 Patent at 11:64–12:5. The Court accordingly construes **"wherein each provided webpage causes corresponding digital media presentation data to be streamed"** to have its **plain meaning** (apart from the Court's constructions of constituent terms).

**CCC. "identifier data"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "information that can be used to correlate the user and each digital media presentation" | "data used to identify the user and the digital media presentation" |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 1; Dkt. No. 143 at 20; No. 2:18-CV-502, Dkt. No. 140, Ex. A at 4. The parties submit that this term appears in Claim 1 of the '609 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "data that can be used to identify the user and to identify the provided corresponding web page."

At the January 10, 2020 hearing, neither party objected to the Court's preliminary construction. *See also* '609 Patent at 13:10–33. The Court accordingly construes **"identifier data"** to mean **"data that can be used to identify the user and to identify the provided corresponding web page."**

**DDD.  "providing identifier data to the user's computer using the first computer system"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| No separate construction needed from "identifier data" | "supplying, from the first computer system to the user's computer, data used to identify the user and the digital media presentation" |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 2; Dkt. No. 143 at 21.

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (apart from the Court's construction of 'identifier data')."  At the January 10, 2020 hearing, neither party objected to the Court's preliminary construction.  The Court therefore construes **"providing identifier data to the user's computer using the first computer system"** to have its **plain meaning** (apart from the Court's construction of "identifier data").

**EEE.  "storing data indicative of the received at least [a] portion of the identifier data using the first computer system"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| No separate construction necessary from "identifier data"; moreover, "the received at least portion of the identifier data" obtains its antecedent basis from the limitation: "receiving at least a portion of the identifier data from the user's computer responsively to the timer applet each time a predetermined temporal period elapses using the first computer system", and therefore does not require separate construction. | "storing on the first computer system data for each repeating pre-programmed equal time interval that equates to the at least portion of the data used to identify the user and the digital media presentation" |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 2; Dkt. No. 143 at 21.

Defendant's response brief does not address this term.  *See* Dkt. No. 150.  Also, this term does not appear in the parties' December 31, 2019 P.R. 4-5(d) Joint Claim Construction Chart. *See* No. 2:18-CV-502, Dkt. No. 140 at Ex. A.  Shortly before the start of the January 10, 2020

hearing, the Court provided the parties with the following preliminary finding: "This term is no longer in dispute." Neither party objected to this preliminary finding.

The Court concludes that this term is no longer in dispute. The Court therefore does not further address this term (apart from constructions of constituent terms such as "indicative of" and "identifier data," which are addressed elsewhere in the present Claim Construction Memorandum and Order).

## FFF. "indicative of"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>    "representative of" | "equates to" |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 2; Dkt. No. 143 at 22; Dkt. No. 150 at 24; No. 2:18-CV-502, Dkt. No. 140, Ex. A at 3. The parties submit that this term appears in Claim 1 of the '609 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [(Expressly reject Defendant's proposal of 'equates to'[)]."

At the January 10, 2020 hearing, Plaintiff agreed with the Court's preliminary construction.

(1) The Parties' Positions

Plaintiff argues that "instead of 'data indicative of this period' meaning data that 'equates to' the period, the specification expressly states that the 'data indicative of this period' means 'a value indicative of the time period,' instead of the actual time period." Dkt. No. 143 at 22 (citing '609 Patent at 12:24–27).

64

Defendant responds that "[e]very use of 'indicative of' in the '609 patent aligns with Google's proposed construction." Dkt. No. 150 at 24. Defendant also argues that "[s]everal disclosures in the '609 patent use the term 'indicative of' in the context of tracking and logging information, similar to the use of the term in claim 1, and reveal that 'indicative of' means 'equates to.'" *Id.* at 25. Further, Defendant argues that disclosure regarding an audio presentation refers to a media file "indicative of" the presentation as being the digital data that constitutes the presentation. *Id.*

Plaintiff replies that "the specification makes clear that 'indicative of' is only representative of the time the presentation was actually streamed for, because otherwise, the specification would have simply recited the time the value [*sic*] *being* the time the presentation was 'actually' streamed for." Dkt. No. 152 at 7. Plaintiff also argues, in the context of surrounding claim language: "Being *indicative* of a cumulative time is precisely *not* 'equates to' a cumulative time, nor must it even be an amount of time at all. For example, a percentage (of the presentation watched) is *indicative* of a cumulative time but is not itself a value of time." *Id.* at 9.

(2) Analysis

Claim 1 of the '609 Patent recites, in relevant part (emphasis added):

1.    A method for tracking digital media presentations delivered from a first computer system to a user's computer via a network comprising:

. . .

storing data *indicative of* the received at least portion of the identifier data using the first computer system;

wherein each provided webpage causes corresponding digital media presentation data to be streamed from a second computer system distinct from the first computer system directly to the user's computer independent of the first computer system;

wherein the stored data is *indicative of* an amount of time the digital media presentation data is streamed from the second computer system to the user's computer; and

wherein each stored data is together *indicative of* a cumulative time the corresponding web page was displayed by the user's computer.

The specification discloses:

> Referring now to FIG. 10, there is shown a block diagram of a process 1000 according to an embodiment of the present invention. Process 1000 commences with a user's computer 20 receiving a web page from system 20 (FIG. 2) at block 1010. Such a received web page may take the form of page 900 (FIG. 9), for example. As is shown in FIG. 9, page 900 includes portion 930, which may be used to play-back user selected content via his computer 20 and a suitable plug-in or media player, for example. As explained herein, *data indicative of the content played* using portion 920 may be supplied by system 30 or a third party's computer system.

'609 Patent at 12:56–66 (emphasis added); *see id.* at 9:9–13 ("computers 30 may digitize the spoken show and store a media file indicative of it (e.g., using file server 36)").

At first blush, this disclosure of "data indicative of the content played" appears perhaps to refer to the content itself. Yet, an at least equally plausible interpretation is that this data merely identifies what content is played. Further, the specification also discloses:

> Where content is directly stored using an operator's system (e.g., computers or computer system 20, FIG. 2), such as by using the methodology of process 400 (FIG. 4) or process 600 (FIG. 6), such a tracking may be achieved by tracking requests from and pages viewed by each visitor, such as in a tabular format. As a system operator maintains control over the operation of system 30 in such a case, system 30 may be monitored to determine how long data is streamed therefrom, for example. *Data indicative of this period*, such as a presentation identifier and a *value indicative of the time the presentation was actually streamed* for, may be logged by system 30 (e.g., using database server 32, for example). For example, it may be determined when a user begins and ends listening to and/or watching a presentation, e.g., a podcast, by tracking when a web page was loaded and for example by determining when streaming of data to such a loaded web page ceases. Where a selected presentation is streamed from computers 20, such a methodology may be directly implemented by system 20, by confirming the content streaming is progressing as expected, for example.

*Id.* at 12:16–35 (emphasis added).

In this disclosure, the data value "indicative of the time the presentation was actually streamed" does not require that the "value" and the "time" must be equal, as Defendant proposes. In other words, the "value" and the "time" need not be one and the same. Instead, this "data

indicative of" need merely facility the "tracking." *Id.* at 12:16–21; *see id.* at 13:36–42 ("cause data indicative of another temporal cycle having passed while the web page presents the presentation"; "a value indicative of the number of cycles that have passed in database 32 may be incremented each time the data is received, for example"). The specification does not compel limiting "indicative of" to Defendant's proposal of "equal to." The contrary opinions of Defendant's expert are unpersuasive. *See* Dkt. No. 150, Ex. 14, Nov. 5, 2019 Houh Decl. at ¶¶ 52–57.

At the January 10, 2020 hearing, Defendant expressed concern that Plaintiff's alternative proposal of "representative of" would create ambiguity by allowing for a mere approximation to be "indicative of." Plaintiff presented no oral argument on this term. The Court finds that Plaintiff's proposal of "representative of" is amorphous and would tend to confuse rather than clarify the scope of the claims.

The Court therefore expressly rejects Defendant's proposed construction as well as Plaintiff's alternative proposed construction, and no further construction is necessary. *See O2 Micro*, 521 F.3d at 1362; *see also Finjan*, 626 F.3d at 1207; *Summit 6*, 802 F.3d at 1291.

The Court accordingly construes **"indicative of"** to have its **plain meaning**.

**GGG. "is indicative of an amount of time the digital media presentation data is streamed from the second computer system to the user's computer"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>  "representative of an amount of time the digital media presentation data is streamed from the second computer system to the user's computer" | "equates to the amount of time that a digital media presentation data is transferred as a substantially steady and continuous stream from the second computer" |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 2; Dkt. No. 143 at 22; Dkt. No. 150 at 25; No. 2:18-CV-502, Dkt. No. 140, Ex. A at 3. The parties submit that this term appears in Claim 1 of the '609 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (apart from the Court's constructions of constituent terms, such as 'indicative of' and 'streamed')"; and "streamed" means "transferred such that data can be processed as a substantially steady or continuous stream and a user's browser or plug-in can start presenting the data before the entire file has been transmitted."

At the January 10, 2020 hearing, neither party objected to the Court's preliminary construction. *See also* '609 Patent at 4:43–47.

The Court therefore construes the larger disputed term **"is indicative of an amount of time the digital media presentation data is streamed from the second computer system to the user's computer"** to have its **plain meaning** (apart from the Court's constructions of constituent terms, such as "indicative of" and "streamed").

The Court further construes **"streamed"** to mean **"transferred such that data can be processed as a substantially steady or continuous stream and a user's browser or plug-in can start presenting the data before the entire file has been transmitted."**

**HHH. "wherein each stored data is together"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| This term cannot be separated from its contextual limitations and should be considered as part of the claim limitation: "wherein each stored data is together indicative of a cumulative time the corresponding web page was displayed by the user's computer", which is not proposed for construction by either party and should receive its plain and ordinary meaning. Moreover, "each stored data" obtains its antecedent basis from "storing data indicative of the received at least portion of the identifier data using the first computer system", and therefore does not require separate construction. | "wherein the sum of the time associated with each set of data that is (1) sent to the first computer system from the user's computer system responsively to, (2) stored at the first computer system, and (3) equates to the amount of time that a digital media presentation data is transferred as a substantially steady and continuous stream from the second computer system to the user's computer"[6] |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 2–3; Dkt. No. 143 at 23; Dkt. No. 150 at 28; No. 2:18-CV-502, Dkt. No. 140, Ex. A at 5–6.  The parties submit that this term appears in Claim 1 of the '609 Patent.  *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "No construction apart from the larger term 'wherein each stored data is together indicative of.'"  At the January 10, 2020 hearing, neither party objected to the Court's preliminary construction.  The Court therefore does not further address this term.

---

[6] Defendant previously proposed: "wherein the sum of the time associated with each stored data" [(See construction of "each stored data")] *or* "wherein the sum of the time associated with each set of data that is (1) sent to the first computer system from the user's computer system at the direction of the timer applet, (2) saved on the first computer system, and (3) represents the amount of time that a digital media presentation data is transferred as a substantially steady and continuous stream from the second computer system to the user's computer."  No. 2:18-CV-502, Dkt. No. 111, Ex. A at 2–3 (emphasis added).

## III. "wherein each stored data is together indicative of"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| This term cannot be separated from its contextual limitations and should be considered as part of the claim limitation: "wherein each stored data is together indicative of a cumulative time the corresponding web page was displayed by the user's computer", which is not proposed for construction by either party and should receive its plain and ordinary meaning. Moreover, "each stored data" obtains its antecedent basis from "storing data indicative of the received at least portion of the identifier data using the first computer system", and therefore does not require separate construction. | "wherein each stored data is together":<br>   "wherein the sum of the time associated with each set of data that is (1) sent to the first computer system from the user's computer system responsively to, (2) stored at the first computer system, and (3) equates to the amount of time that a digital media presentation data is transferred as a substantially steady and continuous stream from the second computer system to the user's computer"[7] |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 3; Dkt. No. 143 at 25; Dkt. No. 150 at 28.

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (apart from the Court's construction of 'indicative of')." At the January 10, 2020 hearing, neither party objected to the Court's preliminary construction. The Court accordingly construes **"wherein each stored data is together indicative of"** to have its **plain meaning** (apart from the Court's construction of "indicative of").

---

[7] Defendant previously proposed: "wherein the sum of the time associated with each stored data" [(See construction of "each stored data")] *or* "wherein the sum of the time associated with each set of data that is (1) sent to the first computer system from the user's computer system at the direction of the timer applet, (2) saved on the first computer system, and (3) represents the amount of time that a digital media presentation data is transferred as a substantially steady and continuous stream from the second computer system to the user's computer." No. 2:18-CV-502, Dkt. No. 111, Ex. A at 2–3 (emphasis added).

**JJJ. "the stored data"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No separate construction necessary because "the stored data" obtains its antecedent basis from "storing data indicative of the received at least portion of the identifier data using the first computer system". | "data that is (1) sent to the first computer system from the user's computer system responsively to the timer applet and (2) stored at the first computer system"[8] |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 4; Dkt. No. 143 at 25; Dkt. No. 150 at 28; No. 2:18-CV-502, Dkt. No. 140, Ex. A at 4. The parties submit that this term appears in Claim 1 of the '609 Patent. *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "This term obtains its antecedent basis from 'storing data indicative of the received at least portion of the identifier data using the first computer system' [(]Expressly reject Defendant's proposal[)]." At the January 10, 2020 hearing, neither party objected to the Court's preliminary construction. The Court therefore finds that **"the stored data"** obtains its antecedent basis from **"storing data indicative of the received at least portion of the identifier data using the first computer system."**

---

[8] Defendant previously proposed: "data that is (1) sent to the first computer system from the user's computer system at the direction of the timer applet and (2) saved on the first computer system." No. 2:18-CV-502, Dkt. No. 111, Ex. A at 4.

**KKK. "each stored data"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No separate construction necessary because "each stored data" obtains its antecedent basis from "storing data indicative of the received at least portion of the identifier data using the first computer system". | "each set of data that is (1) sent to the first computer system from the user's computer system at the direction of the timer applet, (2) saved on the first computer system, and (3) represents the amount of time that a digital media presentation data is transferred as a substantially steady and continuous stream from the second computer system to the user's computer" |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 4–5.

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "No construction apart from the larger term 'wherein each stored data is together indicative of.'" At the January 10, 2020 hearing, neither party objected to the Court's preliminary construction. The Court therefore finds that **"each stored data" requires no discussion apart from the larger term "wherein *each stored data* is together indicative of,"** which is addressed above. The Court accordingly does not further address the term "each stored data."

**LLL. "predetermined temporal period"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>    "previously determined time period" | "pre-programmed equal time interval"[9] |

---

[9] Defendant previously proposed: "repeating pre-programmed equal time interval." No. 2:18-CV-502, Dkt. No. 111, Ex. A at 3.

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 3; Dkt. No. 143 at 26; Dkt. No. 150 at 26; No. 2:18-CV-502, Dkt. No. 140, Ex. A at 3–4.  The parties submit that this term appears in Claim 1 of the '609 Patent.  *Id.* at 4.

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "fixed period of time that is determined in advance of operation of the applet as a timer."

At the January 10, 2020 hearing, Plaintiff agreed with the Court's preliminary construction.

(1)  The Parties' Positions

Plaintiff argues: "[I]n context, the claim itself provides the definition of the term 'predetermined temporal period.'  That is, something happens ('receiving . . .') in response to the timer applet each time some previously determined time period elapses."  Dkt. No. 143 at 26.  Plaintiff also argues that Defendant "improperly limits the scope of the term based on non-limiting embodiments from the specification."  *Id.*

Defendant responds that "[t]he specification and plain meaning make clear that 'predetermined' means 'pre-programmed,'" and "[t]he prosecution history also confirms that 'predetermined' means 'pre-programmed.'"  Dkt. No. 150 at 26.[10]

Plaintiff replies "[c]ontrary to Defendant's argument, there is nothing to prevent a predetermined interval to include a set of different (non-equal) values."  Dkt. No. 152 at 8.

(2)  Analysis

Claim 1 of the '609 Patent recites (emphasis added):

1.   A method for tracking digital media presentations delivered from a first computer system to a user's computer via a network comprising:

---

[10] Defendant also cites statements by the patentee during prosecution of the '609 Patent, but this evidence does not significantly affect the Court's analysis.  *See* Dkt. No. 150, Ex. 15, Aug. 2, 2012 Amendment at 5–7.

. . .

> providing an applet to the user's computer for each digital media presentation to be delivered using the first computer system, wherein the applet is operative by the user's computer as a timer;

> receiving at least a portion of the identifier data from the user's computer responsively to the timer applet each time a *predetermined temporal period* elapses using the first computer system; . . . .

The specification discloses:

> In the case of FIGS. 9 and 10, . . . a timer applet may be used to indicate when a *pre-determined temporal period* has elapsed. For example, such an applet may be used to indicate *each time some temporal period, such as 10, 15 or 30 seconds*, elapses. Such a timer applet may be started at block 1020.

> At block 1030, when the applet determines the *predetermined temporal period* has elapsed, it signals its continued execution to system 20.

'609 Patent at 13:4–12 (emphasis added).

> The specification also uses the term "predetermined" in the following two instances:

> Syndication of Internet content is becoming more commonplace. Really Simple Syndication ("RSS") is a family of Internet feed formats used to publish content that may be frequently updated, such as podcasts (RSS 2.0). RSS utilizes a standardized format. An RSS document (sometimes referred to as a "feed," "web feed" or "channel") typically contains either a summary of content from an associated web site or the full text.

> An RSS may itself be used to aggregate content from multiple web sources in one place. RSS content is typically accessed using an RSS reader application. Such an application may be a thin, web-page based application or a downloaded application executed on a user's computer (e.g., 20, FIG. 1). RSS feeds may typically be subscribed to by entering or selecting the feed's link using the reader. The RSS reader typically checks the user's subscribed feeds for new content at *predetermined intervals*, downloads updates, and provides a user interface to monitor and view the feeds.

> \* \* \*

> In certain embodiments of the present invention, web page views and/or web site visits (e.g., sessions) may be tracked. A page view, as used herein, generally refers to a request made to a web server for a web page, as opposed to just a page component, such as a graphic, for example. A visit, as used herein, generally refers to a sequence of web page and/or component requests from a particular user's computer, within some *predetermined period of time*. Commercially available

server log file analysis applications may be used to gather such information, for example.

'609 Patent at 10:6–24 & 11:37–46 (emphasis added).  Defendant argues that these disclosures demonstrate that "predetermined" means "preprogrammed," but Defendant fails to persuasively support or explain requiring programming.  *See* Dkt. No. 150 at 26.

Defendant also argues that these disclosures demonstrate that "predetermined temporal period" refers to multiple, equal time intervals.  Defendant's proposal is consistent with an example in the specification that refers to "each expiration of *temporal period* as determined by the timer applet, such as *every 15 seconds* . . . ."  *Id.* at 13:24–26 (emphasis added).  This same sentence in the specification, however, states that it is a "non-limiting example."  *Id.*  Other disclosure regarding "every 15 seconds" likewise refers to, "for example," "certain embodiments."  *Id.* at 7:15–38.

Nonetheless, as Defendant urges, "[t]he claims recite only a single 'temporal period'—not plural 'temporal period*s*'" (Dkt. No. 150 at 27), and the word "predetermined" requires that the temporal period must be determined in advance of timing (which, in Claim 1 of the '609 Patent, is performed by operation of the timer applet).  Further, although the claim recites "*a* predetermined temporal period," thereby allowing for "one or more," *each* such period must nonetheless be "predetermined."  Plaintiff's proposal of allowing for a "variable" period of time would fail to give effect to the word "predetermined."  *See In re Varma*, 816 F.3d 1352, 1362 (Fed. Cir. 2016) ("Although the transitional term 'comprising' indicates that the claim is open-ended, the term does not render each limitation or phrase within the claim open-ended.")  Further of note, the specification contains no disclosure of a variable amount of time, let alone how the length of a variable amount of time would be known or communicated as part of the claimed invention.  The

Court therefore expressly rejects Plaintiff's interpretation of "predetermined temporal period" referring to a variable amount of time.

The Court therefore construes **"predetermined temporal period"** to mean **"fixed period of time that is determined in advance of operation of the applet as a timer."**

**MMM.** **"receiving at least a portion of the identifier data from the user's computer responsively to the timer applet each time a predetermined temporal period elapses using the first computer system"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>    "receiving at least a portion of the identifier data from the user's computer in response to the timer applet each time a predetermined temporal period elapses using the first computer system" | "receiving, from the user's computer at the direction of the timer applet each time a repeating pre-programed equal time interval elapses, at the first computer system at least a portion of the data used to identify the user and the digital media presentation" |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 4; Dkt. No. 143 at 27.

Defendant's response brief does not address this term. *See* Dkt. No. 150. Also, this term does not appear in the parties' December 31, 2019 P.R. 4-5(d) Joint Claim Construction Chart. *See* No. 2:18-CV-502, Dkt. No. 140 at Ex. A. Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary finding: "This term is no longer in dispute." Neither party objected to this preliminary finding.

The Court concludes that this term is no longer in dispute. The Court therefore does not further address this term.

**NNN.  "a second computer system distinct from the first computer system"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>    "a separate computer system from the first computer system" | "a computer system unrelated to the first computer system and not commonly controlled or operated by the same party" |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 4; Dkt. No. 143 at 28; Dkt. No. 150 at 22; No. 2:18-CV-502, Dkt. No. 140, Ex. A at 2.  The parties submit that this term appears in Claim 1 of the '609 Patent.  *Id.*

Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (apart from the Court's construction [of] 'computer system')"; "computer system" means "single computing device or collection of computing devices having a common operator or under common control."

At the January 10, 2020 hearing, neither party objected to the Court's preliminary construction.  *See also* '609 Patent at 3:52–55.

The Court therefore construes **"a second computer system distinct from the first computer system"** to have its **plain meaning** (apart from the Court's construction of "computer system").

The Court also construes **"computer system"** to mean **"single computing device or collection of computing devices having a common operator or under common control."**

**OOO.  "providing an applet to the user's computer for each digital media presentation to be delivered using the first computer system"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No separate construction needed from "applet" | "for each digital media presentation delivering an applet from the first computer system to the user's computer" |

No. 2:18-CV-502, Dkt. No. 111, Ex. A at 4; Dkt. No. 143 at 29.

Defendant's response brief does not address this term. *See* Dkt. No. 150. Also, this term does not appear in the parties' December 31, 2019 P.R. 4-5(d) Joint Claim Construction Chart. *See* No. 2:18-CV-502, Dkt. No. 140 at Ex. A. Shortly before the start of the January 10, 2020 hearing, the Court provided the parties with the following preliminary finding: "This term is no longer in dispute." Neither party objected to this preliminary finding.

The Court concludes that this term is no longer in dispute. The Court therefore does not further address this term.

## VII. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit.

As discussed above, the Court finds that "locking means for facilitating an activation of the block means by the timing means" in Claim 4 of the '654 Patent is indefinite because of lack of corresponding structure.

The parties are ordered to not refer to each other's claim construction positions in the presence of the jury. Likewise, in the presence of the jury, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court. The Court's reasoning in this order binds the testimony of any witnesses, and any reference to the claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 20th day of January, 2020.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE